# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

LA MECIA ROSS-TIGGETT,

               Plaintiff,

    v.

REED SMITH LLP, *et al.*,

               Defendants.

Civil No. 15-08083 (RMB/AMD)

**OPINION**

**APPEARANCES:**

La Mecia Ross, Esq.
25103 Osprey Way
Princeton Junction, New Jersey 08550

      Pro se *Plaintiff*

Domenick Carmagnola, Esq.
Sean Patrick Joyce, Esq.
CARMAGNOLA & RITARDI, LLC
60 Washington Street, Suite 300
Morristown, New Jersey 07960

     *On behalf of Defendants Reed Smith LLP and Christine Phillips*

**RENÉE MARIE BUMB, Chief United States District Judge:**

In this case, *pro se* Plaintiff La Mecia Ross (f/k/a Ross-Tiggett) ("**Plaintiff**") has asserted twenty-seven (27) employment discrimination claims under state and federal law against her former law firm, Reed Smith LLP ("**Reed Smith**"), and various individual defendants, including Christine Phillips ("**Ms. Phillips**").  Between 2012 and 2016, Plaintiff was a client services specialist and, eventually, a paralegal in Reed Smith's Princeton, New Jersey office.  She primarily alleges that Reed Smith treated her differently from her younger, white colleagues in training and advancement opportunities, work assignments, and feedback.  She also claims that the firm retaliated against her when she filed complaints and, ultimately, initiated this civil action.

The record evidence, however, tells a much different story.  After Plaintiff was promoted to the paralegal position in 2014, she experienced several challenges adjusting to the demands of her new role.  These deficiencies resulted in a performance improvement plan.  After she complained of mistreatment, the firm launched an internal investigation, and her supervisors met with her about her allegations and her claims for "equal pay for equal work" and "equal access to more substantive work." She was assigned additional cases, and the supervising partner of her workgroup volunteered to serve as her mentor.  Plaintiff's subsequent performance reviews were mixed.  After an incident in which Reed Smith concluded that Plaintiff wrongfully entered an associate's office and took a file without permission, she was removed from her workgroup.  In January 2016, Plaintiff was laid off in a reduction-in-force.

This matter, having languished for years, is now before the Court upon Defendants' Motion for Summary Judgment.  [Docket No. 220.]  They seek summary judgment as to all of Plaintiff's claims, arguing that the record fails to contain sufficient evidence of discrimination and retaliation.    Having considered the parties' submissions[1] without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b), the Court agrees:  there are no genuine disputes of material fact and summary judgment is warranted in Defendants' favor.  For the reasons set forth below, the Motion for Summary Judgment will be **GRANTED**.[2]

## I.    FACTUAL BACKGROUND

The Court sets forth below the undisputed material facts of record, drawing from the parties' statements of material facts[3] and viewing all inferences, doubts, and issues of credibility in favor of Plaintiff, as the non-moving party.  *See Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

---

[1] The parties' submissions are referred to herein as follows: Defs.' Br. Supp. Mot. Summ. J., Docket No. 220-1 ("**Defs.' Br.**"); Pl.'s Opp'n Mot. Summ. J., Docket No. 235 ("**Pl.'s Opp'n**"); Defs.' Reply Br. Supp. Mot. Summ. J., Docket No. 238 ("**Defs.' Reply Br.**"); Cert. of Sean P. Joyce Supp. Mot. Seal, Docket No. 239-1; Pl.'s Opp'n Mot. Seal, Docket No. 240; Defs.' Reply Br. Supp. Mot. Seal, Docket No. 241.

[2] Defendants also seek to seal a confidential memorandum produced following Reed Smith's internal investigation into Plaintiff's claims of discrimination and harassment.  [Docket No. 239.]  For the reasons set forth herein, the Motion to Seal will be **GRANTED** as well.

[3] See Defs.' Statement of Undisputed Material Facts, Docket No. 220-2 ("**Defs.' SOMF**"); Pl.'s Counterstatement of Undisputed Material Facts, Docket No. 235-1 ("**Pl.'s CSOMF**"); and Defs.' Responsive Statement to Pl.'s CSOMF, Docket No. 238-1 ("**Defs.' RSOMF**").

At the outset, however, the Court first observes that Plaintiff's "Counterstatement" of Material Facts fails to comply with Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. This is so for at least two reasons. First, in many instances, Plaintiff's statements are simply unresponsive, containing irrelevant content beyond the scope of Defendants' statement and/or improper legal argument.[4]

---

[4] See, for example, paragraph seven (7) of Plaintiff's statement. [Pl.'s CSOMF ¶ 7.] Defendants' statement is as follows:

> On February 25, 2016, Defendants filed a motion to dismiss the individual defendants. On August 24, 2016, the Honorable Jerome B. Simandle, U.S.D.J. granted Defendants' motion to dismiss as to ten of the eleven individual Defendants with respect to all claims and denied the motion to dismiss as to Defendant Christine Phillips with respect to Plaintiff's discrimination claim under the NJLAD.

[Defs.' SOMF ¶ 7 (internal citations omitted).] Plaintiff's response is as follows:

> **Contested**. This is not a complete recitation of the facts regarding Defendants' Motion to Dismiss Individual Defendants. Beginning on page four (4) of Plaintiff's FAC, Ms. Ross names the Individual Defendants and the position of authority they held within the Reed Smith organization. Throughout her complaint, Ms. Ross identified the individuals who had, delegated or direct, authority to either control her work assignments and schedule, or issue adverse employment actions. For example, Ms. Papanier was a Human Resources manager who had the authority to and did place Ms. Ross on a Performance Improvement Plan ("PIP"), on August 15, 2014. The PIP, attached as exhibit I to Plaintiff's FAC, is on Ms. Papanier's letterhead. Ms. Bettino was the Princeton office's Managing Partner, the head of my former work group, Christine Phillips's boss, and the individual who placed me on administrative leave. Ms. Mariano was the Director of Human Resources Manager at the Reed Smith home office in Pittsburgh, Pennsylvania and Bonita Fenoglietto's supervisor. Ms. Ross pled against the remaining now-dismissed defendants because they engaged in discriminatory micro and, at times, macro aggressive behaviors and/or treatment, and manufactured false negative performance critiques, which included the following discriminatory remarks and references regarding Ms. Ross or her alleged behavior, "some of the other members of the group felt as

though she was trying to do their jobs" DEFTS 407, "I go on record that "I'm not happy about her promotion because she has always been sneaky" Exhibt J, DEF620-621 7, "being accused of rifling through piles on desk . . . and the now alleged "sneakiness" of engaging in the simple task of retrieving a file from a chair in the office, which had been done countless times before without incident; Exhibt J, DEF409-410, "Diane is aware of LeMecia [sic] less than truthful reasons for o.t.", Exhibt J, DEF620-621, "having an attitude" Exhibt J, DEF577, "having odd tendencies" Exhibt J, DEF400-401, "a sense of entitlement" Exhibt J, DEF577, and "understanding my spot in the pecking order" Exhibt J, DEF577, and or citing deficiencies that Ms. Ross wasn't engaged in such as, "I often times catch many careless errors that go beyond typos. She will cut/paste portions of briefs and either forget to change over party names or dollar amounts." Exhibt J, DEF412. Yet, as a member of this workgroup, Ms. Ross did not assigned to brief drafting. Thus, the Individual Defendants were actively involved, either directly or indirectly, in the discriminatory conduct that was used to support Ms. Ross's removal from the workgroup and that Ms. Ross articulates in her FAC. The derogatory performance review was issued on October 29, 2015, twenty-seven (27) days after Ms. Ross was excommunicated and after intentionally excluding Princeton office attorneys from her list of feedback providers given the rapidly deteriorating situation. Exs. J, K, L.

On February 25, 2016, Defendants filed a Motion to Dismiss the Individual Defendants. Exhibit M. In Defendants' brief, Counsel alleges, that Diane Bettino, Carolyn Mariano, and Denise Papanier, were all employees. While that statement is not incorrect, it is incomplete. All three held management positions. All three had the authority to control my work, my benefits such as FMLA, and my work schedule, as evidenced in Exhibit J. Additionally, Defendants Counsel represented at 1116-19, that Ms. Ross chose the individuals who reviewed her, that none of the paralegals, support staff, or HR professionals named as Defendants evaluated her, and that the evaluations were anonymous. However, Exhibits J and L, show that the allegation was and is false and that in Ms. Ross attempted to exclude all Princeton personnel from contributing to this Interim review. On March 21, 2016, Ms. Ross filed a Brief in Opposition to Defendants' Motion to Dismiss Individual Defendants. In that brief, Ms. Ross articulated the direct supervisory roles each individual had and what action they took against her, adverse or otherwise, using their, direct or delegated, supervisory authority. Despite these showings in her F AC and brief, on August 24, 2016, the late and Honorable Jerome B. Simandle, U.S.D.J. granted Defendants'

Such statements are deficient.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of the record . . . ; or (B) showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"); L. Civ. R. 56.1 ("Each statement of material facts . . . shall not contain legal argument or conclusions of law.").  Procedurally, Plaintiff was obligated to address each paragraph of Defendants' Statement of Material Facts in a responsive statement, "indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion."  L. Civ. R. 56.1(a).  A responsive statement under Rule 56.1(a) is not the place to introduce facts beyond the scope of the paragraph challenged, and it is certainly not a place for argument.  *See, e.g.*, *Capps v. Dixon*, 2024 WL 340842, at *2 (D.N.J. Jan. 30, 2024) (Bumb, C.J.) (explaining that a party's statement of material facts must address the "material" facts,

---

Motion to Dismiss as to ten of the eleven individual Defendants with respect to all claims and denied the Motion to Dismiss as to Defendant Christine Phillips with respect to Plaintiff's discrimination claim under the NJLAD. In his accompanying order Judge Simandle "further ORDERED that defendant Phillips shall file her answer to the NJLAD claim in the Complaint within twenty-one (21) days of the entry of this Order." Defs' Exhibit 8, Pg. 2. Defendant Phillip's Answer to the Amended Complaint was not filed until September 27, 2019, Dkt. Entry 172, after discovery was closed. On November 22, 2016, approximately (90) days after Judge Simandle's order dismissing Individual Defendants, Defendants' Counsel produced documents that contained the discriminatory remarks, and references made by several Individual Defendants about Ms. Ross that demonstrated they were actively involved in discriminatory conduct Plaintiff alleged. Exhibit J.

[Pl.'s CSOMF ¶ 7 (errors in original).]

not extraneous details). The place to set forth a competing narrative is in a supplemental statement of material fact, which the moving party can respond to in turn. *See* L. Civ. R. 56.1(a) ("In addition, the opponent may also furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion, if necessary to substantiate the factual basis for opposition."). **Plaintiff's failure to observe these principles significantly frustrated the Court's effort to discern the factual record, requiring the inordinate expenditure of judicial resources**.[5]

Second, Plaintiff's "Counterstatement" of Material Facts fails to comply with the applicable rules because Plaintiff often relies on the unverified allegations contained in her First Amended Complaint to identify the presence of genuinely disputed facts.[6]  This she cannot do.  In the face of conflicting record evidence

---

[5] The task has been onerous, to say the least.  While the Court may have chosen to strike Plaintiff's submission and to have required her—now a practicing attorney—to resubmit her papers to comply with the applicable rules, there comes a point in time when the Court lacks confidence that a litigant will comply.  The Court has reached that threshold here.

[6] See, for example, paragraph one hundred and nine (109) of Plaintiff's statement.  [Pl.'s CSOMF ¶ 109.]  Defendants' statement is as follows:

> Despite Plaintiff's allegations to the contrary, email communications from Ms. Phillips and Fleming Ware, an attorney with the Firm's Princeton office, show that Plaintiff was made aware and provided an explanation for the reassignment of work, which was simply because the due dates fell during the week of Plaintiff's vacation.  See Exhibit 38.

[Defs.' SOMF ¶ 109.] Plaintiff's response is as follows:

> Contest. This statement grossly misconstrues Ms. Ross's FAC and allegations. Ms. Ross is not alleging that she faced retaliation while she was away from the office on vacation. Ms. Ross's FAC is replete with

identified by the moving party, the non-movant plaintiff cannot oppose summary judgment by citing to her unverified complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves."); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 636 (3d Cir. 2007) ("[A]n unverified complaint is not evidence."); *Tripoli Co. v. Wella Corp.*, 425 F.2d 932, 935 (3d Cir. 1970) ("[A] party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion against him."); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). While the Court has endeavored to assess the undisputed facts based on its independent review of the evidence, *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."), the Court considers Defendants' assertions of fact undisputed, unless otherwise noted, *see* Fed. R. Civ. P. 56(e)(2) (explaining that court may consider a party's assertion of fact undisputed for purposes of motion for summary judgment if opposing party "fails to properly address another party's assertion of fact as required by Rule 56(c)").

---

instances of retaliatory and discriminatory conduct and comments by Defendants. See FAC ¶¶ 38-153, 194-198, 228-241, 321-326, 334-342, FAC Exhibit L, DEFTS 300-339, 400-412, 585-620, 665-672., Dkt Entry 166, Ex. C.

[Pl.'s CSOMF ¶ 109.]

With these preliminary observations stated, the Court now sets forth what it determines to be the undisputed facts of record:

### A.    Initial Employment at Reed Smith and 2014 Promotion.

On July 20, 2012, after a few months during which Plaintiff was a "temporary employee," Plaintiff was hired as a non-billable client services specialist in the Princeton, New Jersey office of Reed Smith.  [Defs.' SOMF ¶¶ 53, 54.]  Plaintiff reported to Michele Reasoner, the Office Manager.  [*Id.* ¶ 54.]  After Plaintiff first started at the firm, she acknowledged receipt of various Reed Smith policies and procedures.  [*Id.* ¶ 85; *see also* Reed Smith Policies & Procs., Defs.' Ex. 36, Docket No. 220-5.]  For her first two years, Plaintiff worked principally on a large commercial bank's mortgage foreclosures in a non-billable capacity for Donna Bates and Aaron Bender, Esqs.  [*Id.* ¶ 55; Pl.'s CSOMF ¶ 55.]  According to Mr. Bender, Plaintiff "would often take a lot of time to complete projects because she wanted her work to be perfect."  [Sept. 16, 2015, Memorandum, at 6, Defs.' Ex. 22, Docket No. 221 (regarding La Mecia Ross Internal Investigation) (hereinafter, the "**2015 Memorandum**").]  But Mr. Bender had "positive things to say about Ms. Tiggett's work . . . . especially since the work was non-billable."  [*Id.*]  Even though Plaintiff's position was non-billable, Plaintiff alleges that she routinely performed the duties of a billable paralegal.  [Defs.' SOMF ¶ 56.]

Evidently, Plaintiff's supervisors took notice of her hard work.  At some point in early 2014, Ms. Phillips, the assignment paraprofessional for the Financial Industry

Group ("**FIG**"), recommended that Plaintiff join the group. [*See* 2015 Memorandum at 7.]   Diane Bettino, Esq., the supervising partner of the FIG and the managing partner of the Princeton office, agreed. [*Id.*]   In April or May 2014, Plaintiff began receiving formal assignments from Ms. Phillips, [2015 Memorandum at 8], and on July 1, 2014, Plaintiff was promoted to the billable position of Tier 1 Paralegal and situated in the FIG. [Defs.' SOMF ¶¶ 43, 57–60.]   According to her promotion memorandum, Plaintiff's immediate supervisor was Beth Weller and her manager was Janet Sullivan. [July 2, 2014, Memorandum at 1, Defs.' Ex. 27, Docket No. 220-5.] She was notified that "[a]ll overtime must be pre-approved by [her] supervisor." [*Id.* at 1.]

### B.   Documented Workplace Issues.

Shortly after joining the FIG, however, Plaintiff experienced difficulties adjusting to her new role.   Unlike her prior department, the FIG had more constraints due to client cost sensitivities and strict financial margins. [Defs.' SOMF ¶¶ 59–60; 2015 Memorandum at 29–30.]   As a result of these constraints, Ms. Bettino reported that she ran a "tight ship," that she exercise[d] more oversight of paralegals, and that paralegals ha[d] less freedom to "come and go without express permission." [2015 Memorandum at 30; Defs.' SOMF ¶ 60.]   It is clear from the record that the demands of the new position proved challenging for Plaintiff.

Take an incident from July 31, 2014, for example.   Prior to her promotion, Plaintiff had scheduled time off from August 1 through August 8, 2014. [Defs.' SOMF ¶ 63.]   Ms. Reasoner, Plaintiff's former supervisor, approved this vacation. [Pl.'s

10

CSOMF ¶ 63.]  The day before it was scheduled to begin, Ms. Reasoner e-mailed Plaintiff asking her to notify her team and the other paralegals who were providing vacation coverage in her absence.  [Defs.' SOMF ¶ 64; *see also* July 31, 2014, 11:28 a.m. e-mail from Ms. Reasoner to Plaintiff, Defs.' Ex. 29, Docket No. 220-5.]  It is not clear whether Plaintiff contacted her colleagues accordingly.  [*See* Defs.' SOMF ¶¶ 64–66; Pl.'s CSOMF ¶¶ 64–66.]  Later that day, Ms. Reasoner e-mailed Plaintiff to ask whether she was coming into the office as expected.  [Defs.' SOMF ¶ 65; *see also* July 31, 2014 12:47 p.m. e-mail from Ms. Reasoner to Plaintiff, Defs.' Ex. 30, Docket No. 220-5 ("Are you coming in today?  I know you were going to be late but we thought you would be in by 10:30 am?").]  Plaintiff did not immediately respond, as she was apparently involved in a personal matter in family court.  [*See* Defs.' SOMF ¶¶ 65–66.] Later that afternoon, Plaintiff asked for permission to work from home, but Ms. Weller indicated that partner approval was required to do so.  She also asked Plaintiff whether everything was okay and whether she let anyone know that she would be arriving to the office after 10:30 a.m.  [Pl.'s CSOMF ¶¶ 65–66; *see also* First Am. Compl., Pl.'s Ex. 1 (unorganized e-mails), Docket No. 9-12, at 9–27.]  At 3:17 p.m., Plaintiff e-mailed Mses. Bettino, Weller, Phillips, and Reasoner that her daughter was not feeling well and that she was waiting for an appointment.  [July 31, 2014, 3:17 p.m. e-mail from Plaintiff to Ms. Bettino et al., Pl.'s Ex. 1, Docket No. 9-12, at 15.]  Plaintiff began her scheduled vacation the next day.  [Defs.' SOMF ¶ 63.]

However, between August 3 and August 6, 2014, Plaintiff worked remotely for approximately 12 hours without permission.  [Defs.' SOMF ¶¶ 67–68.]  Because

Plaintiff worked during her scheduled time off, Plaintiff was owed overtime, which Reed Smith paid.  [*Id.* ¶ 68; Pl.'s CSOMF ¶ 68.]  On August 6, 2014, Plaintiff e-mailed Ms. Mariano about "long-standing very recent and sensitive challenges that have developed," and they agreed to speak over the phone later.  [Defs.' SOMF ¶ 69.]

On August 12, 2014, Ms. Bettino contacted Ms. Reasoner about the amount of overtime Plaintiff was using to complete assignments.  [Defs.' SOMF ¶ 70; *see also* August 12, 2014, e-mails between Mses. Bettino and Reasoner, Defs.' Ex. 33, Docket No. 220-5 ("I am starting to get a little concerned about the constant overtime requests. She should be getting her work done during the day.").]  Ms. Reasoner indicated that she, Ms. Weller, and Ms. Denise Papanier, Reed Smith's Director of Northeast Operations, would be meeting with Plaintiff to discuss time management and reporting concerns.  [Defs.' SOMF ¶¶ 45, 61, 70–71; *see also* August 12, 2014, 2:21 p.m. e-mail from Ms. Reasoner to Ms. Bettino, Defs.' Ex. 33.]   Ms. Bettino also communicated these concerns to Plaintiff earlier that day, writing:

> Mecia, I am not seeing the need for so much overtime.  Please check with Christine [Phillips] on your assignments and timing.  Overtime is not a standard issue and should not be a normal thing.  I appreciate your work ethic but we think that you should be able to get your work done during the standard work hours.  Overtime is a cost to the firm, which eats into our bottom line and profitability.

[August 12, 2014 1:27 p.m. e-mail from Ms. Bettino to Plaintiff and Mses. Weller and Phillips, Defs.' Ex. 33.]

Moreover, on August 14, 2014, Plaintiff apparently arrived at the office at 7:00 a.m. and worked until 3:00 p.m., taking her lunch during a "non-core hour" so that

she could leave the office during the late afternoon. [Defs.' SOMF ¶ 74.] Per Reed Smith policy, lunch breaks could only be taken between 12:00 and 2:00 p.m.—the "core" hours for lunch—unless approved otherwise by a supervisor. [Defs.' SOMF ¶¶ 72–73.] Plaintiff often took her lunch during non-core hours without receiving prior express permission to do so. [*Id.* ¶ 75.] Ms. Bettino also expressed concerns to Ms. Reasoner that Plaintiff was often out of the office in the late afternoon. [*Id.* ¶ 74.]

**C.**    **August 15th Meeting and Performance Improvement Plan.**

On August 15, 2014, Mses. Weller, Sullivan, and Papanier met with Plaintiff to discuss a variety of concerns, including the July 31st incident. [Defs.' SOMF ¶ 45, 61; *see also* Aug. 18, 2014, Memorandum, Defs.' Ex. 32, Docket No. 220-5 (Ms. Weller summarizing meeting with Plaintiff, directed to Ms. Papanier's attention).] Thereafter, Plaintiff was placed on a performance improvement plan. [Defs.' SOMF ¶ 61; *see generally* Aug. 22, 2014, Mem., Defs.' Ex. 28, Docket No. 220-5 (hereinafter, "**PIP**").] Recognizing that Plaintiff "may be having a rough transition" because "work assignments are more structured in this new position," Mses. Weller, Sullivan, and Papanier identified a few core areas for improvement:

> [I]n order to be successful, you must demonstrate the ability to follow the directions of your supervisor and give proper PTO notification, work your core hours from 8:30 a.m. to 5:00 p.m. daily and notify your team and your supervisor if you need to alter those hours at any time. Be mindful of keeping your office door open, as appropriate, to remain approachable to your team and co-workers. Also please remember to request permission to work overtime and request permission to work from home. Complete projects in accordance with the instructions submitted with the work request and comply with the department procedures that are in place, etc. In order to meet these expectations, we

must see immediate and sustained improvement. Accordingly, please
have bi-weekly conversations with Beth Weller.

[PIP at 1–2.]  Having conferred with Plaintiff and discussed examples of concerning

conduct, Ms. Papanier reported that she was "more confident that [she] now ha[s] a

better understanding of policies and procedures" regarding "work hours, time

reporting, [] communication, working from home, time management and overtime."

[*Id.* at 1.]

## D.   Plaintiff's Internal Complaint and Reed Smith's Investigation.

Immediately before Plaintiff attended the August 15, 2014, meeting with Mses.

Papanier, Weller, and Sullivan, Plaintiff sent a letter to Ms. Carolyn Mariano, Reed

Smith's Human Resources Director.  [Defs.' SOMF ¶ 76.]  In her letter, she stated that

"if this meeting results in disciplinary action and/or termination[,] [she] would like to

file a formal Harassment Complaint."  [Defs.' SOMF ¶ 76; *see also* Aug. 15, 2014, Ltr.

from Plaintiff to Ms. Mariano, Defs.' Ex. 34, Docket No. 220-5.]  The letter does not

identify whether Plaintiff believed that she had been discriminated against or harassed

on the basis of a protected category.  [*Id.*]  The letter refers to an August 11, 2014,

phone call that Plaintiff had with Ms. Mariano, following their e-mail exchange

regarding "sensitive" concerns.  [*Id.*]  After receiving the letter, Ms. Mariano asked

Ms. Papanier to investigate.  [Defs.' SOMF ¶ 78.]  Ms. Papanier worked with Ms.

Stephanie Wilson, Esq., who interviewed several Reed Smith employees, reviewed

applicable documents, and ultimately recorded her investigation conclusions in the

2015 Memorandum identified above.  [*Id.*]  During Ms. Wilson's first meeting with

Plaintiff, Plaintiff stated that "things are tense now but workable." [Defs.' SOMF ¶ 79; 2015 Memorandum at 15.] Ms. Wilson asked whether she believed she was being treated differently because of her race, and Plaintiff stated that she did not know. [*Id.*] Ms. Wilson asked Plaintiff what she hoped to achieve by filing the harassment complaint.

On September 8, 2014, Plaintiff wrote to Mses. Mariano and Wilson to answer this question. [Defs.' SOMF ¶ 80; Sept. 8, 2014, Ltr. from Plaintiff to Mses. Mariano and Wilson, Defs.' Ex. 35, Docket No. 220-5 ("**September 2014 Memorandum**").] Plaintiff indicated that she "would like equal pay for equal work," observing that there were employees "who were hired after to me to higher paying positions that the one I held while doing the exact same work." [September 2014 Memorandum at 1 (errors in original).] She also stated that she would like "equal access to more substantive work, trainings, promotions, assignments (when they are available) and a career track on pace with that of my peers" and she would like her "credentials assessed fairly." [*Id.*] Moreover, she requested "fair and equal treatment when it comes to any negative consequences that I <u>might</u> incur" and "the same opportunity as my peers to be informed of any mistakes that I might make before raising the concern of a supervisor or Partner." [*Id.* at 2.] Finally, among other things, she indicated that she had not been offered any mentorship opportunities. [*Id.*]

On September 12, 2014, Ms. Wilson met with Plaintiff to discuss each item identified in the September 2014 Memorandum. [Defs.' SOMF ¶ 81; *see also* 2015 Memorandum at 19.] In response to Plaintiff's request for "equal pay for equal work,"

Plaintiff stated that Ms. Bettino "had already taken care of it" by giving her "good work." [*Id.*]  In fact, the record shows that Ms. Bettino met with Plaintiff on August 19, 2014, during which she explained her expectations, provided Plaintiff with direction, and indicated that she would place Plaintiff on "bigger cases," which Plaintiff was "happy about." [2015 Memorandum at 15.]  They also discussed that Plaintiff required prior permission to work on the weekends and that Ms. Phillips was in charge of work assignments and that her decisions must be respected. [*Id.* at 18.] To address Plaintiff's request for "equal access to more substantive work," Ms. Wilson notes that Ms. Bettino assigned Plaintiff two new cases. [*Id.*; *see also* Defs.' SOMF ¶ 82; Pl.'s CSOMF ¶ 82.]  In response to Plaintiff's request for mentorship, Ms. Wilson observes that Ms. Bettino volunteered to serve as her mentor. [2015 Memorandum at 19; Defs.' SOMF ¶ 83.]  During Plaintiff's meeting with Ms. Wilson, Plaintiff stated that she wanted to be included in Ms. Bettino's team and that she felt like she had been working on an "island." [Defs.' SOMF ¶ 84; 2015 Memorandum at 19.]  Ms. Wilson and Plaintiff discussed that it takes time to establish working relationships. [*See* 2015 Memorandum at 19–20.]  While Plaintiff reported feeling shunned, she stated that she stopped feeling that way after her August 19, 2014, meeting with Ms. Bettino. [*Id.* at 21.]

Ultimately, Ms. Wilson concluded that no harassment was discovered, and she reported her conclusion to Plaintiff. [*Id.*]

### E.      Certain Post-PIP Conduct.

After Plaintiff's September 12, 2014, meeting with Ms. Wilson, additional workplace issues developed.  The principal issue concerned an unauthorized entry into an associate's office.  On September 19, 2014, Plaintiff entered Laura Conroy's office without permission, removed a file, read comments that were not addressed to her attention, and questioned Ms. Conroy and Ms. Phillips about the comments.  [Defs.' SOMF ¶ 116; 2015 Memorandum at 22.]  On the same day, Ms. Bettino also emailed Ms. Papanier explaining that she had met with Plaintiff in her office to counsel her about refraining from performing other colleagues' jobs because it was wasting time and driving up costs.  [2015 Memorandum at 22.]  She also expressed frustration that she was routinely having her lunch late in the day in order to take her children to appointments.  [*Id.*]  Ms. Bettino indicated that she tried to be flexible, but that Plaintiff's early departures were becoming a "regular thing."  [*Id.*]  Based on these events, and the other issues identified above and in the PIP, Ms. Bettino "felt that Ms. Tiggett could no longer work in her Group because of concerns about client data privacy and Ms. Tiggett's improper entry into Ms. Conroy's office and review of the file."  [*Id.*]  Mses. Mariano, Papanier, and Wilson ultimately concluded that Plaintiff should be removed from the FIG due to a legitimate business reason, but that she should not be terminated.  [*Id.*]

**F.      Removal from the Financial Industry Group, Paid Administrative Leave, and Subsequent Termination.**

On October 2, 2014, Plaintiff was notified by Ms. Papanier that she was no longer a paralegal in the FIG.  [*See* Defs.' SOMF ¶ 117; 2015 Memorandum at 23.] Following her removal from the FIG, Mses. Weller and Sullivan assigned work to Plaintiff directly.  [*See* Defs.' SOMF ¶ 118; 2015 Memorandum at 22.]  She continued working at the firm, but she no longer worked with attorneys in the FIG.

On October 29, 2014, Plaintiff received an Interim Paraprofessional Evaluation for her performance as a paralegal.[7]  [Defs.' SOMF ¶ 114; *see also* Defs.' Ex. 39, Docket No. 220-5.]  The review was mixed, containing positive feedback and constructive criticisms.  [*See generally* Defs.' Ex. 39.]  However, over the course of the following year, multiple attorneys—including a Princeton-based attorney and a New York-based attorney—expressed concern about working with Plaintiff due to mistakes that she had made on their projects.  [Defs.' SOMF ¶ 118; 2015 Memorandum at 37.]

On November 18, 2015, Plaintiff was placed on administrative leave with pay.[8] [Defs.' SOMF ¶¶ 51, 119; Pl.'s CSOMF ¶ 118; *see also* Personnel Action Form, Defs.'

---

[7] The Court notes that Plaintiff complained to Ms. Weller on September 19, 2014, when she asked Plaintiff to identify names of attorneys from whom to solicit feedback for her Interim Paraprofessional Evaluation, noting she had "heard nothing about a three month review" and that "[g]iven the nature of the events that [had] transpired," she did not "believe that any positive feedback would be received here." [2015 Memorandum at 21–22.]

[8] Defendants state that Plaintiff was placed on administrative leave on November 15, 2015, before this civil action was filed, whereas Plaintiff insists that she was placed on leave on November 17, 2015, after she filed this case.  [*Compare* Defs.' SOMF ¶ 51, *with* Pl.'s CSOMF ¶ 51.]  Neither proposition is entirely true.  The

Ex. 25, Docket No. 220-5.]  As Plaintiff admits, Ms. Bettino placed Plaintiff on administrative leave because "she had gotten reports that [Plaintiff] had been taunting people."  [Pl.'s Obj. & Resp. Defs.' Interrog. No. 24, Defs.' Ex. 40, Docket No. 220-5; Defs.' SOMF ¶ 119.]

On January 14, 2016, Plaintiff was one of multiple paraprofessionals at Reed Smith whose positions were eliminated in a reduction-in-force.  [Defs.' SOMF ¶ 120; *see also* Jan. 14, 2016, Ltr. from Michael C. Lynch to Plaintiff & Severance Mem., Defs.' Ex. 26, Docket No. 220-5.]  Defendants state that over a dozen Tier I paralegals were terminated from the firm, "several of whom were younger than Plaintiff."  [Defs.' SOMF ¶ 121.]

### G.    Other Facts Relevant to Plaintiff's Allegations of Discrimination.

Plaintiff claims that she was subjected to disparate treatment and harassment on the basis of race and age, and that she was retaliated against after complaining of discrimination and harassment.  [*See generally* First Am. Compl., Docket No. 9.]  The Court sets forth additional factual background relevant to these claims:

At least as of September 16, 2015, Plaintiff was the only African-American paralegal in the Princeton Office of Reed Smith.  [2015 Memorandum at 25.]  She was 42 years old as of the date the First Amended Complaint was filed.  [Defs.' SOMF ¶ 39; Pl.'s SOMF ¶ 39.]  Plaintiff claims that Reed Smith discriminated against persons

---

evidence clearly shows that the effective date of Plaintiff's leave of absence was "11/18/15."  [See Personnel Action Form, Defs.' Ex. 25 (executed 12/2/2015).]

of color by "downgrad[ing]" positions with correspondingly lower levels of pay after being filled by a person of color.  [First Am. Compl. ¶¶ 159, 160.]  In support of this claim during Plaintiff's deposition, she referenced two other African Americans, a woman named, "Lori," who worked as a client services specialist, and a man named, John Ricks, who worked in Reed Smith's mailroom.  [*See, e.g.*, Dep. of La Mecia Ross-Tiggett at 618:14–625:15 Defs.' Ex. 21, Docket No. 220-5; *see also* Defs.' SOMF ¶¶ 94–97.]  She did not know Lori's rate of pay during her employment at the firm.  [Defs.' SOMF ¶ 97.]  John Ricks did not work as a client services specialist or paralegal. [Defs.' SOMF ¶ 97.]

Plaintiff also claims that Reed Smith discriminated against her on the basis of her age because her work was reassigned to Megan Cichon-Mantsis, Maria Frias, Greyson Van Dyke, and Amanda Gorbatuk, paralegals who were all younger and not African American.  [First Am. Compl. ¶¶ 212, 213.]  During her deposition, Plaintiff explained that she had "circumstantial evidence" to support her claim that her age was a factor in the decision to remove her from the FIG—"the simple fact that these people were all younger than me.  They had less experience than me."  [Pl.'s Dep. 362:2–3; Defs.' SOMF ¶ 102.]  Plaintiff was 39 years old when she was hired for the position of client services specialist.  [Defs.' SOMF ¶ 105.]  She was 41 years old when she was promoted to the paralegal position.  [*Id.* ¶ 106.]

## H.    Plaintiff's Allegations Concerning Medical Leave.

On September 11, 2015, Plaintiff requested intermittent medical leave.  [Defs.' SOMF ¶ 124; Pl.'s CSOMF ¶ 124; First Am. Compl. ¶ 351 & Exs., Docket No. 9-17,

at 11–12.]  Plaintiff claims that she completed Reed Smith's Family Leave Provider Certification form but that Reed Smith nevertheless denied one of her requests to stay home to care for her child.  [First Am. Compl. ¶ 352.]  The parties refer the Court to an e-mail exchange on October 13, 2015.  [Defs.' SOMF ¶ 126; Pl.'s CSOMF ¶ 126.] Plaintiff wrote to Bonita Fenoglietto, a Reed Smith Benefits Coordinator, regarding a doctor's appointment scheduled for October 14, 2015, requesting advice because her Family and Medical Leave Act (FMLA) request had yet to be approved.  [Oct. 13, 2015, 3:14 p.m. e-mail from Plaintiff to Ms. Fenoglietto, "Pl.'s Ex. L-6," Docket No. 9-17, at 17.]  Ms. Fenoglietto clearly indicated in reply that the firm's FMLA certification had yet to be received from Plaintiff's daughter's doctor, and so FMLA requests would be reviewed on a "case-by-case basis."  [Oct. 13, 2015, 5:05 p.m. e-mail from Ms. Fenoglietto to Plaintiff, Docket No. 9-17, at 16.]  In any case, she approved the request as "FMLA time," "assuming [Plaintiff's daughter's] appointment tomorrow is related to the condition described in the original FMLA certification."  [*Id.*]  Plaintiff, however, never provided Ms. Fenoglietto with a completed FMLA certification for the visit.  [Defs.' SOMF ¶ 127.]

## II.   PROCEDURAL HISTORY

On June 9, July 16, and July 30, 2015, Plaintiff filed charges with the Equal Employment Opportunity Commission ("**EEOC**") against Reed Smith for discrimination, disparate treatment, and retaliation based on race, color, gender, age, and religion.  [Defs.' SOMF ¶ 4; *see also* 2015 Memorandum at 1.]  Each of the charges was dismissed on the grounds that the EEOC was unable to conclude that Plaintiff's

allegations established violations of the applicable employment statutes. [Defs.' SOMF ¶¶ 5, 6; *see also* 2015 Memorandum at 2.] Plaintiff was advised of her right to sue by notices dated July 23 and August 11, 2015. [*Id.*]

Following notice of Plaintiff's EEOC charges, Ms. Mariano advised Plaintiff that Ms. Wilson would be conducting an internal investigation into Plaintiff's allegations of harassment and discrimination. [Defs.' SOMF ¶ 24; *see also* Aug. 11, 2015, e-mail from Ms. Mariano to Plaintiff, Defs.' Ex. 23, Docket No. 220-5.] On September 16, 2015, Ms. Wilson concluded Reed Smith's internal investigation, summarized her findings in the 2015 Memorandum, and determined that Plaintiff's allegations of discrimination and retaliation were not supported. [Defs.' SOMF ¶ 49.] On October 7, 2015, Ms. Wilson e-mailed Plaintiff, notifying her that all of her claims of retaliation and discrimination were investigated, including those that pre-dated her EEOC charges, and that Reed Smith was unable to conclude that retaliatory, discriminatory, or otherwise unlawful conduct occurred. [Defs.' SOMF ¶ 50; *see also* Oct. 7, 2015, e-mail from Ms. Wilson to Plaintiff, Defs.' Ex. 24, Docket No. 220-5.] On November 18, 2015, Plaintiff was placed on administrative leave with pay. [Defs.' SOMF ¶ 51; Personnel Action Form, Defs.' Ex. 25; *see also supra* note 8.]

## A.   This Civil Action.

On November 16, 2015, two days before she was placed on administrative leave, Plaintiff filed this civil action against Defendants. [*See* Compl., Docket No. 1; Defs.' SOMF ¶ 1.] On January 28, 2016, Plaintiff filed the First Amended Complaint, asserting **twenty-seven (27) causes of action** against Reed Smith and **eleven (11)**

**individual defendants**, comprising the Managing Partner of the firm's Princeton, New Jersey office, five paraprofessionals, three attorneys, and two human resources professionals. [*See generally* First Am. Compl.; Defs.' SOMF ¶ 3.] Plaintiff asserts that Defendants discriminated and retaliated against her in violation of Title VII of the Civil Rights Act (Counts I–V) and the New Jersey Law Against Discrimination (Counts XIII–XVIII, XX–XXIII), and the Age Discrimination in Employment Act of 1967 (Counts VI–X). [First Am. Compl.] Plaintiff also asserts that Defendants violated the Equal Pay Act (Counts XI and XIX), the Family and Medical Leave Act of 1993 and the New Jersey Family Leave Act (Counts XII and XXV), and the New Jersey Conscientious Employee Protection Act (Count XXIV). [*Id.*] Finally, Plaintiff asserts that Defendants are liable for "negligent retention and/or supervision" (Count XXVI) and "New Jersey's Public and Private Defamation Statute" (Count XXVII). [*Id.*]

On February 25, 2016, Defendants filed a Motion to Dismiss the claims asserted against the individual defendants, [Docket No. 17], and on August 24, 2016, the Honorable Jerome B. Simandle granted Defendants' Motion, in part, dismissing all claims asserted against the individual defendants, except for Plaintiff's discrimination claim against Defendant Phillips under the New Jersey Law Against Discrimination. [Mem. Op. & Order, Docket Nos. 48, 49.] Reed Smith did not move to dismiss Plaintiff's claims at the pleading stage. [*See generally* Docket; *see also* Mem. Op. at 10 ("Reed Smith has not filed a motion to dismiss and all claims asserted against them

are therefore not subject to dismissal and remain alive.").]  The matter proceeded to discovery.

### B.    Discovery.

Discovery in this matter was fiercely disputed and persistently delayed, often as a result of Plaintiff's last-minute extension and/or adjournment requests as well as, most troublingly, Plaintiff's blatant failure to comply with orders of the Court.  (As discussed below, this misconduct persisted throughout the course of this litigation.)  The Court only recounts a high-level summary here, as the docket adequately illustrates the fraught nature of the discovery process.

On October 18, 2016, the Court entered a Scheduling Order providing that Plaintiff's deposition would be conducted on November 29, 2016.  [Docket No. 56, at 1.]  The very day before her scheduled deposition, Plaintiff deposited an adjournment request in the Clerk's Office after-hours box in Camden because Plaintiff was preparing for her 1L exams.  [Docket No. 58; Pl.'s CSOMF ¶ 8.]  At the time, Plaintiff was a first-year law student at Fordham University School of Law.  [Defs.' SOMF ¶ 39.]  Plaintiff did not appear for the deposition, [Defs.' SOMF ¶ 8], and disputes soon arose regarding information that Defendants sought from Plaintiff, [*see* Docket Nos. 57, 58, 59].  The Court scheduled an in-person conference for December 14, 2016, to address these issues. [Docket No. 60.]  The conference was rescheduled at Plaintiff's request because it conflicted with one of her 1L exams.  [*See* Docket Nos. 62, 63.]

On December 14, 2016, the Court rescheduled the in-person conference for January 9, 2017.  [Docket No. 67.]  Unfortunately, Plaintiff's son became ill, and she

requested an adjournment of the conference and a sixty-day stay of this matter. [Docket No. 68.]  The Court held a telephone conference on January 26, 2017, [Docket No. 73], and the matter was stayed until February 28, 2017, [Docket No. 74]. Plaintiff's deposition was ordered to occur on March 15 and 16, 2017.  [*Id.*]

After the first day of Plaintiff's deposition, a dispute arose concerning Plaintiff's production of certain documents requested by Defendants.  [Defs.' SOMF ¶ 9; Pl.'s CSOMF ¶ 9.]  The Court permitted the parties to file discovery applications.  [Docket No. 88.]  On June 2, 2017, Defendants filed a Motion to Compel all documents and audio recordings that Plaintiff claimed to have in her possession regarding conversations between her and Reed Smith employees, as well as handwritten notes that Plaintiff prepared following a meeting with two Reed Smith employees.  [Docket No. 92.]  Plaintiff filed a Motion to Compel various categories of documents, including personnel files.  [Docket No. 93.]  The Court granted Defendants' Motion to Compel, in part, ordering Plaintiff to produce to Defendants her alleged audio recordings and handwritten notes, [Docket No. 106, at 19–20]; the Court denied Plaintiff's Motion to Compel, without prejudice, and determined that the scope of the comparator evidence sought by Plaintiff would be discussed at a conference scheduled for April 4, 2018, [Docket No. 107, at 16–17].  On April 5, 2018, after concluding that the scope of the evidence sought by Plaintiff was too broad, the Court ordered Plaintiff to provide a letter "containing the names of those persons who Plaintiff asserts are comparators and whose personnel files Plaintiff requests to be produced by Defendants."  [Docket No. 108, at 1.]

25

On June 12, 2018, after additional discovery disputes arose between the parties, [*see* Docket Nos. 110, 112, 113, 116, 117, 118], the Court held a conference and ordered that the second day of Plaintiff's deposition would occur on June 20, 2018, [Docket No. 121, at 2]. A mere day before the deposition was scheduled to occur, Plaintiff sought an adjournment because the deposition conflicted with her daughter's high school graduation. [Docket No. 123.] Defendants consented to the request, [Docket No. 124], and the Court ordered the deposition to occur on June 22, 2018, [Docket No. 125]. Plaintiff's deposition was completed as scheduled. [Docket No. 129.]

On October 11, 2018, the Court ordered an in-person status conference for November 6, 2018. [Docket No. 142.] On October 31, 2018, Plaintiff sought to adjourn the conference, [Docket No. 143], and the matter was converted to a telephone conference, [Docket No. 145]. The day before the telephone conference, Plaintiff requested another adjournment. [Docket No. 146.] On November 5, 2018, the Court rescheduled the conference to December 19, 2018, and ordered Plaintiff to comply with its order of March 29, 2018, *i.e.*, to produce her alleged audio recordings and handwritten notes by no later than December 18, 2018. [Docket No. 147, at 2.] Judge Donio advised the parties that any failure to abide by the Order may result in the imposition of sanctions pursuant to Federal Rule of Civil Procedure 16(f). [*Id.*]

Plaintiff failed to produce the audio recordings and handwritten notes by December 18, 2018. [Docket No. 148.] Worse, Plaintiff failed to attend the conference that the Court rescheduled multiple times at Plaintiff's request. [Docket No. 149.]

After failing to appear, Plaintiff filed an untimely request to adjourn, contending that she had previously "communicated her unavailability and her inability to comply with these dates as her exam period just ended on December 19, 2018." [Docket No. 150.] But like some of her other requests, she failed to explain why her adjournment submission was filed after-the-fact and why the Court was required to foresee, and plan around, *her* availability to litigate this action.

On January 4, 2019, citing Plaintiff's failure to comply with the Court's March 29 and November 5, 2018, Orders, Defendants filed a Motion to Dismiss for Failure to Prosecute and Complete Discovery. [Docket No. 151.] Judge Donio scheduled oral argument to address Defendants' Motion. [Docket No. 155.] On April 30, 2019, Judge Simandle referred the Motion to Judge Donio to address on a report-and-recommendation basis. [Docket No. 161.] **On August 7, 2019, Judge Donio recommended dismissing Plaintiff's claims as a sanction for her repeated delay and willful contravention of her court-ordered obligations**. [Docket No. 164.]

On August 13, 2019, this action was reassigned to the Court upon the death of the Honorable Jerome B. Simandle. [Docket No. 165.] On August 21, 2019, Plaintiff filed her objections to Judge Donio's Report and Recommendation. [Docket No. 166.] The Court heard oral argument on September 26, 2019, [Docket No. 171], and entered an Order granting in part and denying in part Defendants' Motion to Dismiss, without prejudice, [Docket No. 170]. The Court precluded Plaintiff from using her alleged handwritten notes and audio recordings as a sanction for failing to comply with Judge Donio's prior orders, and the Court issued a "last warning" to Plaintiff that any

27

further violation of a discovery order, scheduling order, or other deadline set by the Court would automatically result in the dismissal of this case with prejudice, absent a showing of good cause.  [*Id.* at 2.]  Plaintiff appealed the Court's September 26, 2019, Order [Docket No. 170].  [Notice of Appeal, Docket No. 178.]

On October 28, 2019, the Court administratively terminated this action pending disposition of Plaintiff's appeal.  [Docket No. 181.]  The Court stated that "[o]nce the appeal is decided the Court will promptly direct the Clerk of Court to reopen the matter, and the Final Pretrial Conference will be rescheduled."  [*Id.*]  On April 27, 2020, the Court of Appeals for the Third Circuit dismissed Plaintiff's appeal for lack of jurisdiction.  [Docket No. 185.]

## C.     Failure to Prosecute.

**Years** after the Third Circuit dismissed Plaintiff's appeal, the Court issued a Text Order directing Plaintiff to show cause whether she intended to prosecute this action.  [Feb. 3, 2023, Text Order, Docket No. 186.]  Having received no response from Plaintiff over thirty days later, the Court issued another Text Order indicating that the action would be dismissed within ten days pursuant to Local Civil Rule 41.1. [Mar. 9, 2023, Text Order, Docket No. 187.]  On March 10, 2023, Plaintiff filed a letter advising the Court that she had not received the Court's Text Orders and that she intended to prosecute this action.  [Docket No. 188.]  The Court scheduled an in-person conference for April 26, 2023.  [Docket No. 189.]

On April 3, 2023, Plaintiff filed another Notice of Appeal concerning the Court's February 3 and March 9, 2023, Text Orders, [Docket No. 191[9]], and the Court issued an Order advising Plaintiff that her failure to appear at the hearing would result in the dismissal of her claims with prejudice, [Docket No. 192].  On April 26, 2023, the Court held a hearing in this matter regarding Plaintiff's delay in prosecuting this action.  [Docket No. 195.]  During the hearing, Plaintiff, now a graduate of Fordham University School of Law and practicing attorney in the State of New York, represented that she had never received the Court's Text Orders or the Order of the Third Circuit dismissing her appeal.  [Docket No. 196, at 2.]  She also represented that she had not electronically accessed the docket of this matter because she is proceeding *pro se*.  [*Id.*]  For these reasons, she submitted that she had no reason to know the current posture of her lawsuit against Reed Smith.  [*Id.*]  The Court questioned the veracity of Plaintiff's representations and scheduled an evidentiary hearing for May 31, 2023, to assess "whether Plaintiff had notice of the Third Circuit's Order and the Court's Text Orders and why Plaintiff permitted this case to lay dormant for nearly three years without filing anything on the docket."  [*Id.* at 2–3.]

On the day of the hearing at 12:19 a.m., Plaintiff left a voice mail with the Court's courtroom deputy requesting an adjournment due to a medical emergency in her family.  [Docket No. 204.]  As a result, the Court postponed the hearing to June

---

[9] On July 17, 2023, the Third Circuit dismissed Plaintiff's appeal for "failure to file civil information statement, concise summary of the case, and to order a transcript of the proceedings in the lower court as required or to notify the Court that a transcript is not necessary for the prosecution of the appeal."  [Docket No. 214.]

6, 2023.  [Docket No. 204.]  On June 7, 2023, after the hearing occurred, the Court issued an Order finding that "Plaintiff likely did not receive notice of the Third Circuit's April 27, 2020 Order or the Court's February 3 and March 9, 2023 Text Orders *via U.S. mail*."  [Docket No. 207, at 3.]  However, the Court "did not adopt a finding as to whether Plaintiff received notice of such Orders via PACER, finding Plaintiff's credibility questionable and determining that Plaintiff must produce documentation establishing that she did not have PACER access during the applicable period, as she testified."  [*Id.*]  The Court authorized Defendants to serve a third-party subpoena to obtain information concerning Plaintiff's PACER account.  [*Id.* at 6, ¶ 3.]  Following Plaintiff's submission of documentation to establish that her PACER account was disabled for nonpayment during the applicable period, [Docket No. 211], the Court permitted Defendants to proceed by filing a motion for summary judgment, pursuant to the Court's June 7, 2023, Order.[10]  [See Docket No. 207, at 6, ¶ 4.]

---

[10] Defendants issued a third-party subpoena pursuant to the Court's Order and filed a letter on the docket authored by an Assistant General Counsel of the Administrative Office of the United States Courts, which is responsible for PACER. [Docket No. 213.]  The Assistant General Counsel objected to the scope of Defendants' request on privacy grounds, among others, [*see* Docket No. 212, at 1; Docket No. 213, at 1]; however, he provided some relevant information, including the fact that Plaintiff's PACER account was accessed on November 8 and 13, 2019, that the next time the account was accessed was May 1, 2023, and that the account was suspended from December 2019 until May 2023.  [Docket No. 213, at 2.]  Although the Court did not adopt a credibility finding, it has no reason at this juncture to further question whether Plaintiff accessed the docket between November 13, 2019, and May 1, 2023.

**D.      Defendants' Motion for Summary Judgment.**

Defendants filed their Motion for Summary Judgment on September 15, 2023. [Docket No. 220.]  After seeking three extension requests—the circumstances of which the Court will not rehash here[11]—Plaintiff filed her Brief in Opposition on December 8, 2023.  [Docket No. 235.]  Defendants filed their Reply Brief on December 29, 2023. [Docket No. 238.]  As the Motion for Summary Judgment is fully briefed, it is ripe for adjudication.

**E.      Defendants' Motion to Seal.**

In support of their Motion for Summary Judgment, Defendants rely on the 2015 Memorandum, a document prepared following Reed Smith's internal investigation into Plaintiff's allegations of discrimination and retaliation.   [Docket No. 221.] Defendants seek to seal the document because it contains private and confidential information regarding Reed Smith personnel.  [Docket No. 239.]  Plaintiff opposes Defendants' Motion to Seal, [Docket No. 240], and Defendants have filed a Reply Brief, [Docket No. 241].   As the Motion to Seal is fully briefed, it too is ripe for adjudication.

**III.   LEGAL STANDARDS**

**A.      Summary Judgment.**

A court may grant a motion for summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of

---

[11] But see Docket Nos. 222, 223, 224, 225, 226, 229, 230, 231, 232, 233, 234.

law.  Fed. R. Civ. P. 56(a).  A fact is "material" only if it "might impact the outcome of the suit under the governing law."  *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party.  *Id.*  The moving party is entitled to summary judgment if it can demonstrate that the nonmoving party cannot meet the essential elements of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding whether there is a genuine issue of material fact, the court must view all inferences, doubts, and issues of credibility in favor of the non-moving party.  *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." *Connection Training Servs. v. City of Phila.*, 358 F. App'x 315, 318 (3d Cir. 2009).  "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate."  *Id.*

In the face of a properly supported motion for summary judgment, the non-movant's burden is rigorous.  The non-movant "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.  *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (noting that "speculation and

32

conjecture may not defeat a motion for summary judgment") (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).   Nor will bald assertions in a party's brief.  *See Dabone v. Thornburgh*, 734 F. Supp. 195, 199 (E.D. Pa. 1990) ("[A]ssertions in briefs are not competent evidence unless agreed to by the adverse parties.") (citing *Braden v. Univ. of Pittsburgh*, 477 F.2d 1, 6 (3d Cir. 1973)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' "  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (quoting *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

**B.**     ***Pro Se* Litigants.**

Generally, when a party is proceeding *pro se*, the court has an obligation to construe her pleadings "liberally."[12]  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  For example, this requires the court to "apply the applicable law, irrespective of whether a *pro se* litigant has mentioned it by name."  *Holley v. Dep't of Veteran Affs.*, 165 F.3d 244, 248 (3d Cir. 1999).  "However, despite this liberal interpretation, the same standards for summary judgment apply to *pro se* litigants."  *Watson v. Phil. Hous. Auth.*, 629 F. Supp. 2d 481, 485 (E.D. Pa. 2009) (citation omitted).  In other words, the party

---

[12] The Court considers Plaintiff a *pro se* litigant and construes her pleadings liberally, even though she is a graduate of Fordham University School of Law and appears to have been practicing law in the State of New York since 2021.  *Cf. Kay v. Ehrler*, 499 U.S. 432, 437 (1991) (holding that *pro se* litigant who was also a lawyer could not be awarded attorney's fees under 42 U.S.C. § 1988, and recognizing that "[e]ven a skilled lawyer who represents himself is at a disadvantage in contested litigation").

opposing summary judgment, whether or not *pro se*, "must present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial. *Id.* (citation omitted).

## IV.   DISCUSSION[13]

Defendants move for summary judgment as to all claims asserted in Plaintiff's First Amended Complaint. [Defs.' Br. at 3.] They submit that Plaintiff's allegations are not supported by competent evidence and that the record demonstrates that Reed Smith had legitimate reasons for each of the actions that Plaintiff believes to be discriminatory or retaliatory. [*Id.*]

For ease of discussion, the Court addresses Plaintiff's twenty-seven (27) causes of action in the following groups: (A) alleged discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and the New Jersey Law Against Discrimination ("**NJLAD**"), N.J. Stat. Ann. § 10:5-12; (B) alleged discrimination in violation of the Age Discrimination in Employment Act of 1967 ("**ADEA**"), 29 U.S.C. § 621, *et seq.*, and the NJLAD; (C) alleged violations of the Equal Pay Act, 29 U.S.C. § 206(d); (D) alleged violations of the Family and Medical Leave Act of 1993 (the "**FMLA**"), 29 U.S.C. § 2601, *et seq.*, and the New Jersey Family

---

[13] This Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, as it has original jurisdiction over Plaintiff's federal claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.*, the Equal Pay Act, 29 U.S.C. § 206(d), and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.*, and supplemental jurisdiction over Plaintiff's state-law claims, which "are so related . . . that they form part of the same case or controversy."

Leave Act (the "**NJFLA**"), N.J. Stat. Ann. 34:11B-1, *et seq.*; (E) alleged violations of the New Jersey Conscientious Employee Protection Act ("**CEPA**"), N.J. Stat. Ann. § 34:19-1; (F) alleged "negligent retention and/or supervision"; and (G) alleged violations of "New Jersey's Public and Private Defamation Statute." [*See generally* First Am. Compl.]  After addressing these claims, the Court turns to Defendants' Motion to Seal.

### A.    Title VII and NJLAD.

The Court begins with Plaintiff's various theories of racial discrimination and retaliation in violation of Title VII and the NJLAD.  In Counts I–V of the First Amended Complaint, Plaintiff asserts that she suffered several violations of Title VII on account of race, including disparate treatment, failure to hire and/or promote, discriminatory treatment in the terms and conditions of her employment, hostile work environment, as well as retaliation.  In Counts XIII–XVIII and XX–XXIII, she alleges violations of the NJLAD on account of her race and age, many of which overlap with her Title VII claims.  The Court focuses on her theory of racial discrimination here.[14]

Title VII and the NJLAD are anti-discrimination statutes that prohibit an employer from engaging in race discrimination against an employee.[15]  *Phillips v.*

---

[14] The Court addresses Plaintiff's claim that she suffered discrimination on account of her age in Section IV.B.

[15] Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual . . . , because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The NJLAD proscribes employment discrimination as follows: "It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or an employer, because of

35

*Starbucks Corp.*, 624 F. Supp. 3d 530, 539 (D.N.J. 2022).  In connection with this prohibition, these statutes also protect an employee who complains of discrimination.[16]  Plaintiff's Title VII and NJLAD claims are all controlled by the familiar three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[17]  *See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841–42 (3d Cir. 2016) ("All retaliation and discrimination claims brought under Title

---

the race . . . of any individual . . . to refuse to hire or employ or to discharge" the employee.  N.J. Stat. Ann. § 10:5–12(a).

[16] Under Title VII, an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation . . . under this subchapter."  42 U.S.C. § 2000e-3(a).  The NJLAD prohibits retaliation against an employee because that employee "has opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the NJLAD.]"  N.J. Stat. Ann. § 10:5–12(b).

[17] The Court observes that Plaintiff's claims are all asserted under a pretext theory, not a mixed-motive theory.  [*See, e.g.,* Pl.'s Opp'n at 10, 16 (arguing that Defendants' justifications for each of her asserted adverse employment action were pretextual).]  Under the latter theory, the *McDonnell Douglas* framework does not apply, as a plaintiff contends that both legitimate and discriminatory reasons for an employment decision co-exist.  *See Watson v. Se. Pa. Transp. Auth.*, 207 F.3d 207, 216 (3d Cir. 2000) (observing that the basis of the mixed-motive theory is that the plaintiff suffers discrimination even though there may also be a legitimate reason for the adverse action).  To defeat summary judgment under this theory, a plaintiff must present "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'"  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003); *see also Makky v. Chertoff*, 541 F.3d 205, 213–14 (3d Cir. 2008) (explaining that a plaintiff need not present direct evidence of discrimination under a mixed-motive theory).  Here, even if Plaintiff were proceeding under a mixed-motive theory, which she is not, Plaintiff could not establish that Reed Smith's actions were motivated, in part, by impermissible discrimination for the same reasons explained herein.

VII and the NJLAD, including those based on sex, race, and disability, which rely on circumstantial evidence, are controlled by . . . *McDonnell Douglas*[.]") (collecting cases).[18]

Under this framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination or retaliation by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). If the plaintiff succeeds in establishing a prima facie case, then the burden shifts to the defendant to articulate some legitimate reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. The defendant "satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The defendant's burden on this score is "relatively light" because the plaintiff always maintains the ultimate burden of proving intentional discrimination. *Id.* (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253, 254, 256 (1981)). Finally, if the defendant can meet its burden, then the plaintiff must show that the legitimate reasons offered by the defendant were not its true reasons but mere pretext. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999); *Fuentes*, 32 F.3d at 763.

---

[18] Like the *Tourtellotte* court, this Court's discrimination and retaliation inquiries are the same for Plaintiff's Title VII claims as they are for her NJLAD claims, *see* 636 F. App'x at 842, so the Court does not address them separately.

Here, the Court begins with Plaintiff's burden of establishing a prima facie case of discrimination or retaliation before turning to the latter two steps of the *McDonnell Douglas* framework.  To be clear, step one is an "evidentiary standard, not a pleading requirement."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002).

### 1.    The Prima Facie Case.

#### a.    *Racial Discrimination Claims.*

Plaintiff asserts that Reed Smith violated Title VII and the NJLAD by limiting her employment and promotional opportunities, failing to properly train her (unlike her similarly situated colleagues), "writing her up" for "fallacious" performance issues, placing her on a PIP, dismissing her from the FIG, placing on her administrative leave with pay, and ultimately terminating her employment in a reduction-in-force, all on account of her race.  [*See* First Am. Compl. ¶¶ 154–93, 251–79, 298–304, 313–320, 327–342; *see also* Pl.'s Opp'n at 12.]  Attempting to disentangle Plaintiff's allegations of discriminatory conduct as best it can, the Court categorizes her claims into three conceptually distinct theories of injury: (i) disparate treatment, (ii) wrongful termination, and (iii) hostile work environment.  The Court is mindful that "the elements of a prima facie case depend on the facts of the particular case." *Jones*, 198 F.3d at 411.

Still, the elements of the first two theories overlap and can be summarized as follows:  To establish a prima facie case of racial discrimination in violation of Title VII or the NJLAD, a plaintiff must show that: (1) she is a member of a protected class;

(2) she suffered an adverse employment action; and (3) the adverse employment action gives rise to an inference of unlawful discrimination. *Compare Tourtellotte*, 636 F. App'x at 842 (stating elements applicable to wrongful termination theory under Title VII and NJLAD) (citing *Jones*, 198 F.3d at 410–11), *with Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318–19 (3d Cir. 2000) (stating similar elements applicable to disparate treatment theory under Title VII), *and Rogers v. Alternative Res. Corp.*, 440 F. Supp. 2d 366, 371 (D.N.J. July 27, 2006) (same for NJLAD). The first element is not disputed. Plaintiff was the only African-American paralegal in the Princeton office of Reed Smith. [*See* 2015 Memorandum at 25.] The latter two are disputed.

"A Title VII plaintiff must prove that she suffered an adverse employment action in order to satisfy step one of *McDonnell Douglas*." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)). To constitute an "adverse employment action," the action must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (internal quotation marks and citation omitted). In other words, "[i]f an employer's act substantially decreases an employee's earning potential and causes significant disruption in her or her working conditions, a tangible adverse employment action may be found." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999). As to establishing an inference of discrimination, a plaintiff may use any relevant evidence, including "comparator evidence," evidence of similar racial discrimination occurring against other employees, or direct evidence of statements or actions suggesting racial

animus.  *See Phillips*, 624 F. Supp. 3d at 540.  "Comparator evidence" is "evidence that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff."  *Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2016)).

Here, Plaintiff's different theories of injuries all fail because she cannot establish that she suffered an adverse employment action under circumstances that suggest racial discrimination.

First, consider Plaintiff's claim that she was discriminated against on account of race because, after expressing interest in advancement, she was "never offered the opportunity to apply" for positions that were filled by Ms. Cichon, Mr. Van Dyke, and Ms. Frias, her Caucasian colleagues.  [*See* First Am. Compl. ¶¶ 30–36; *see also* Pl.'s Opp'n at 12–13.]  She claims that these Reed Smith employees were all promoted within six months to a year of their start date, while it took her until July 1, 2014— over two years—to receive a promotion.  [Pl.'s Opp'n at 12–13.]  But Plaintiff has not introduced any record evidence that she applied for the positions that were filled by Ms. Cichon, Mr. Van Dyke, and Ms. Frias.  While she made a general inquiry to Ms. Reasoner in a November 9, 2012, e-mail, about an interest in a future case assistant position, [Defs.' SOMF ¶¶ 88–89], she did not apply for an open position.  Moreover, Plaintiff does not point to any record evidence that she was denied a promotion or, for instance, rebuffed after seeking more information about a specific job.  Accordingly, this theory fails to establish an adverse employment action.  *See, e.g.*, *McCann v. PNC Fin. Servs. Grp.*, 2020 WL 4915704, at *7 (D.N.J. Aug. 21, 2020) (explaining that to

show failure-to-promote, a plaintiff must show, among other things, that she applied for and was qualified for a particular position and that she was rejected from the position) (citation omitted).

Similarly, Plaintiff has alleged that she did not receive sufficient training when she joined the FIG—that she was "thrown to the wolves" (her words)—whereas Mr. Van Dyke, Ms. Cichon, and Ms. Frias received adequate training.  [*E.g.*, First Am. Compl. ¶ 176; 2015 Memorandum at 28.]  She claims that she was treated "less favorably than similarly situated employees who were not part of her protected class with respect to training, orientation, discipline, and opportunities for advancement." [Pl.'s Opp'n at 14.]  The record evidence, however, tells a different story.

When Plaintiff started working at Reed Smith in 2012, she acknowledged the firm's policies and procedures.  [Defs.' SOMF ¶ 85.]  When she was promoted, Plaintiff attended paralegal orientation in early July 2014.  [*Id.* ¶ 86.]  She received specific, client-focused training from Ms. Phillips and attorneys on Ms. Bettino's team too.  [2015 Memorandum at 30.]  Furthermore, to her credit, Plaintiff often sought out training opportunities and took numerous courses through the "Reed Smith University" between 2012 and 2015.  [*Id.* ¶ 87.]  As to her colleagues, Plaintiff has failed to support her assertion that they received more training on account of race.  *See Dabone v. Thornburgh*, 734 F. Supp. 195, 199 (E.D. Pa. 1990) ("[A]ssertions in briefs are not competent evidence unless agreed to by the adverse parties.") (citing *Braden v. Univ. of Pittsburgh*, 477 F.2d 1, 6 (3d Cir. 1973)).  Plaintiff points to no record evidence in this regard.  Therefore, she has failed to meet her prima facie burden of showing

41

disparate treatment in training. *See Albright v. City of Phila.*, 399 F. Supp. 2d 575, 588–89 (E.D. Pa. 2005) (explaining that deprivation of equal access to training opportunities can constitute an adverse employment action, and citing to significant direct and circumstantial evidence that precluded summary judgment).

Next, consider Plaintiff's claim that her supervisors "fabricated performance reviews" and unjustifiably placed her on a PIP. [*E.g.*, First Am. Compl. ¶ 181; Pl.'s Opp'n at 14.] As with her other theories, Plaintiff ties this claim to her assertion that her colleagues were not disciplined as harshly as she or similarly placed on a PIP. [Pl.'s Opp'n at 14.] Once again, the record is devoid of the necessary evidence to support Plaintiff's claim. Plaintiff fails to cite evidence suggesting that any performance issue was "fabricated." To the contrary, the evidence before the Court clearly documents her supervisors' concerns regarding attendance, communication, and time management (including use of overtime without permission), among other issues. [*See, e.g.*, PIP 1–2; 2015 Memorandum at 30–31; Defs.' SOMF ¶¶ 63–75.] Moreover, Plaintiff has not introduced any evidence to show that her colleagues had similar performance issues and were treated differently as a result of race. Unlike Plaintiff, Ms. Cichon, Ms. Frias, and Mr. Van Dyke had no problems with time or attendance. [*See* 2015 Memorandum at 31.] Given these circumstances, where Plaintiff has not adduced any evidence to question Reed Smith's actions or otherwise justify her assertion of disparate treatment, there is no question that her placement on a PIP does not constitute an adverse employment decision. *See, e.g., Reynolds v. Dep't of Army*, 439 F. App'x 150, 153 (3d Cir. 2011) (explaining that "a PIP is not an adverse

42

employment action" because a PIP—"far from working a change in employment status"—is designed to improve an employee's performance of her existing duties and responsibilities).   Accordingly, Plaintiff's theory of disparate treatment based on "fallacious" performance issues fails.  *See, e.g.*, *Woodard v. PHB Die Casting*, 255 F. App'x 608, 610 (3d Cir. 2007) (affirming entry of summary judgment based on plaintiff's failure to establish prima facie case of disparate treatment "because [plaintiff] did not introduce evidence that he was subject to an adverse employment action").[19]

Finally, consider Plaintiff's assertion that she was discriminated against based on race when she was removed from the FIG, placed on administrative leave with pay, and ultimately terminated in a reduction-in-force.  [*E.g.*, First Am. Compl. ¶¶ 273–79.] To prevail as to her removal from the FIG or placement on administrative leave, she must establish, among other things, that these actions significantly impacted her terms,

---

[19] During Plaintiff's deposition, she claimed that "[o]ther mothers when their children are sick, they flex their time, and they're not getting in trouble."  [Pl.'s Dep. at 275:7–9, Defs.' Ex. 21.]  She asserts that these mothers were not disciplined, while she was, because of their race.  However, she was not able to recall the name of an employee to support her allegation.  [*See id.* at 275:5–17.]  In paragraph 93 of her Counterstatement of Material Facts, Plaintiff now refers to "Susan Romeo" as that employee, [Pl.'s CSOMF ¶ 93], but she cites no corresponding record evidence to substantiate her belated realization that it was Ms. Romeo who routinely "flexed" her time to care for her children without reprisal.  As a result, Plaintiff's rebuttal does not create a genuine dispute of material fact as to her disparate treatment theory.  *See, e.g.*, *Parker v. Sch. Dist. of Phila.*, 823 F. App'x 68, 72 (3d Cir. 2020) (finding that summary judgment was warranted in employment dispute because plaintiff had failed to introduce evidence to justify her "unsupported assumptions").  In any case, Plaintiff's reference to Ms. Romeo for the first time in her Opposition Brief is insufficient to preclude summary judgment.

43

conditions, or privileges of employment.  *See Cardenas*, 269 F.3d at 263 (explaining that an "adverse employment action" must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment"); *Evans*, 166 F.3d at 153 ("If an employer's act substantially decreases an employee's earning potential and causes significant disruption in her or her working conditions, a tangible adverse employment action may be found.").  The undisputed facts here show that after Plaintiff was removed from the FIG on October 2, 2014, she continued receiving assignments from Mses. Weller and Sullivan, and her compensation was not negatively affected.  [Defs.' SOMF ¶¶ 117, 118; *see also* 2015 Memorandum at 23 (noting that Plaintiff's salary *increased* as part of the annual review process in late 2014 / early 2015).]  On November 18, 2015, she was placed on administrative leave with pay because Ms. Bettino had received reports that Plaintiff was "taunting people." [Defs.' SOMF ¶¶ 51, 119; Pl.'s CSOMF ¶ 118; *see also* Personnel Action Form, Defs.' Ex. 25; Pl.'s Obj. & Resp. Defs.' Interrog. No. 24, Defs.' Ex. 40.]  Under these circumstances, Plaintiff has not established a prima facie case that her removal from the FIG or her paid administrative leave were adverse employment actions.  *See, e.g.*, *Miller v. Aluminum Co. of Am.*, 679 F. Supp. 495, 504 (W.D. Pa. 1988) ("[T]emporary transfers or demotions which reduce the employee's duties and responsibilities but maintain her salary and benefits as before do not constitute adverse employment actions.") (citing *Ferguson v. E.I. duPont de Nemours & Co.*, 560 F. Supp. 1172, 1201 (D. Del. 1983); *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987)); *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) ("A paid suspension pending an investigation

of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision.").

The Court's analysis of Plaintiff's claim of wrongful termination, however, is slightly different.[20]  To make out a prima facie case of discrimination in a reduction-in-force case, a plaintiff must show "(1) that she is a member of a protected class, (2) she was qualified for the position in question, (3) she was terminated, and (4) individuals not within the protected class were retained."  *Lepore v. Lanvision Sys., Inc.*, 113 F. App'x 449, 452 (3d Cir. 2004) (citation omitted).  Plaintiff's theory would appear to turn on the last element—what is, essentially, the circumstance raising an inference of discrimination, *see Brown v. Boeing Co.*, 468 F. Supp. 2d 729, 734 (E.D. Pa. 2007)—though the Court observes that Plaintiff has made no effort to establish any of these elements.  [*See* Pl.'s Opp'n at 12–15.]  To prove that "individuals not within the protected class were retained," Plaintiff must introduce evidence concerning "similarly situated" employees outside the protected class—*i.e.*, colleagues who worked in the same area as Plaintiff, in approximately the same position.  *See Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 249–50 (3d Cir. 2002); *see also Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004) ("In order to determine who might qualify as a similarly situated employee we must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular

---

[20] Defendants concede that termination, no matter the circumstances, is necessarily "adverse."  [*See* Def.'s Br. at 9.]

workplace.").   This information being nowhere in the record,[21] the Court must conclude that Plaintiff has failed to meet her burden of demonstrating wrongful termination too.  *See Brown*, 468 F. Supp. 2d at 734 (granting summary judgment to employer because plaintiff had not identified a similarly situated, non-protected class member who was retained in the reduction-in-force (RIF), which is necessary "to establish an inference of causation in a RIF situation").

Nor has Plaintiff met her burden of establishing her theory of a hostile work environment.  [*E.g.*, First Am. Compl. ¶¶ 187–93, 327–33 (Counts IV and XXII).]  To establish a prima facie claim of a hostile work environment under Title VII and the NJLAD, a plaintiff must show that (1) she suffered intentional discrimination because of race, (2) the discrimination was pervasive and regular, (3) it detrimentally affected her, (4) it would have detrimentally affected a reasonable person of the same protected class in her position, and (5) that there is a basis for liability.  *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (citation omitted); *see Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 626 A.2d 445, 453 (1993) (reciting substantially similar elements for an NJLAD claim).  "In evaluating a hostile work environment claim under both Title VII and the [NJ]LAD, we are mindful that 'offhanded comments, and isolated incidents

---

[21] Plaintiff has gestured at Ms. Cichon, Mr. Van Dyke, and Ms. Frias on occasion throughout this litigation and in her brief, [*e.g.*, Pl.'s Opp'n at 13], but the Court has an insufficient basis to conclude that these Reed Smith employees are the basis of her reduction-in-force theory.  Rather, Plaintiff appears to contend than an unidentified person was hired to fill her position in connection with her termination.  [*See* Pl.'s Opp'n at 12 (claiming that she was "speciously included in a RIF, while another person was hired for the position").]  Without this critical evidence, Plaintiff's claim of wrongful termination cannot proceed.

(unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver*, 420 F.3d at 262 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Rather, the "sine qua non of a hostile work environment claim is a 'workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 421 (D.N.J. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). The conduct must be so extreme as to "amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.

Here, Plaintiff makes no effort to show how the above elements apply to the record evidence. Rather, she merely speculates, without support, that Mses. Weller and Phillips were "stewing in their own animus" while she was on vacation in August 2014 and "manufactured deficiencies" resulting in her placement on a PIP. [*See* Pl.'s Opp'n at 19.] Plaintiff also asserts, in conclusory fashion, that she "has demonstrated that the discrimination was pervasive and regular and demonstrated daily, how she faced one demoralizing event after another until the time she was discharged." [*Id.* at 20.] These unsupported assertions do not establish a hostile work environment claim, *see Caver*, 420 F.3d at 262, as "a litigant cannot rely on suspicions, simple assertions, or conclusory allegations" to avoid summary judgment. *Parker v. Sch. Dist. of Phila.*, 823 F. App'x 68, 72 (3d Cir. 2020) (citing *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981)). Therefore, Plaintiff has failed to meet her prima facie burden as to her hostile work environment claims.

Finally, the Court addresses Plaintiff NJLAD claim against Ms. Phillips. Resolving Defendants' Motion to Dismiss at the pleading stage, the Court permitted a discrimination claim to proceed against Ms. Phillips under a theory of individual liability. [*See* Mem. Op. ¶ 43.]  The Court noted that Ms. Phillips' "exact supervisory role" was not clear, but it assumed the truth of Plaintiff's allegations that she excluded Plaintiff from client cases, "locked" her out of workgroups, and denied her access to documents while giving assignments to younger, white employees. [*Id.*]  As Plaintiff should recognize, the Court was required to accept these factual allegations as true and construe the First Amended Complaint in the light most favorable to her.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  At the pleading stage, the Court concluded—and concluded only—that Plaintiff had alleged sufficient facts to "raise a reasonable expectation that discovery will reveal evidence of" her NJLAD-based discrimination claim against Ms. Phillips. [*See* Mem. Op. ¶ 41 (citing *Phillips*, 515 F.3d at 234).]  It did not.

The NJLAD makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." N.J. Stat. Ann. § 10:5–12(e). Although personal liability under the NJLAD arises under the language of "aiding and abetting," New Jersey courts have held that an individual "can aid and abet, not only the conduct of another person, but that person's own conduct." *DeSantis v. New Jersey Transit*, 103 F. Supp. 3d 583, 591 (D.N.J. 2015) (citing *Cicchetti v. Morris Cnty. Sheriff's Office*, 947 A.2d 626, 645 (N.J. 2008)).  To hold an employee liable as an aider and

abettor, a plaintiff must show that (1) the employer whom the defendant aided performed a wrongful act causing an injury, (2) the defendant was generally aware of her role as part of an overall illegal or tortious activity at the time that she provided the assistance, and (3) the defendant knowingly and substantially assisted the principal violation.  *Cicchetti*, 947 A.2d at 645 (citing *Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. 2004)).

Here, Plaintiff submits that Ms. Phillips is liable as an aider and abettor because she exercised influence in the FIG and "manufactured" performance deficiencies, leading to her dismissal and ultimate termination.  [Pl.'s Opp'n at 29–30.]  She focuses most of her argument on establishing that Ms. Phillips exercised supervisory authority over her.  [*Id.* at 26–29.]  Having considered Plaintiff's submission and the record evidence, the Court determines that Plaintiff has woefully failed to prove up her allegations of Ms. Phillips' misconduct.  While it is undisputed that Ms. Phillips served as the assignment paraprofessional for the FIG whose work allocations Ms. Bettino asked Plaintiff to "respect," [*see* 2015 Memorandum at 7, 16; *see also id.* at 18 (noting that Ms. Phillips "was in charge of the work assignments")], Plaintiff has failed to introduce credible evidence of any intentional wrongful conduct on her part.  Rather, the record evidence demonstrates that Ms. Phillips' reassignment of Plaintiff's matters to other paralegals was because their due dates occurred while Plaintiff was on vacation in August 2014.  [Defs.' SOMF ¶ 109.]  Moreover, Ms. Bettino dismissed Plaintiff from the FIG, not Ms. Phillips.  [*Id.* ¶ 135.]  Plaintiff has not introduced any evidence that a jury could weigh to find that she manufactured performance problems

that led to Plaintiff's dismissal from the group. In short, there is no evidence of "illegal or tortious" activity arising from Ms. Phillips' "active and purposeful conduct." *See Cicchetti*, 947 A.2d at 594–95. Accordingly, the Court must dismiss the NLJAD claim against Ms. Phillips.

### b.   *Retaliation Claims.*

Next consider Plaintiff's claims of retaliation. To establish a prima facie case of retaliation under Title VII or the NJLAD, a plaintiff must show that (1) she engaged in protected activity, (2) the employer took an adverse employment action against her, and (3) there is a causal connection between the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006); *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 800 (3d Cir. 2003); *Goosby*, 228 F.3d at 323; *Rogers*, 440 F. Supp. 2d at 376.

Here, Plaintiff claims that Reed Smith engaged in a pattern of "retaliatory acts" after she contacted Ms. Mariano, Reed Smith's Human Resources Director, on August 6 and August 15, 2014, to lodge a complaint for harassment. [*See, e.g.*, First Am. Compl. ¶¶ 195–98 (Count V).] The string of "retaliatory actions" includes the same conduct on which she bases her racial discrimination claims, including "malicious performance write-ups and reviews," administrative leave, and termination. [*Id.* ¶¶ 196, 197.] She also claims that she was retaliated against after filing her EEOC charges. [*E.g.*, *id.* ¶ 338.] In her Opposition Brief, however, Plaintiff does not address how the record evidence demonstrates a prima facie case of retaliation under Title VII

50

and the NJLAD, focusing exclusively on retaliation under the ADEA instead.  [See Pl.'s Opp'n at 22.]  Defendants respond that "Plaintiff has presented no evidence that the elimination of her position was connected to her discrimination complaint." [Defs.' Br. at 10.]

Having reviewed the record evidence, the Court will assume that Plaintiff has presented a prima facie case of retaliation under Title VII and the NJLAD.  Plaintiff was engaged in a protected activity when she complained to Ms. Mariano on August 15, 2014, [Defs.' SOMF ¶ 76; *see also* Aug. 15, 2014, Ltr. from Plaintiff to Ms. Mariano, Defs.' Ex. 34, Docket No. 220-5], and when she filed EEOC charges on June 9, July 16, and July 30, 2015, [Defs.' SOMF ¶ 1].  *See Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 98 (3d Cir. 2016) (noting that the filing of an EEOC charge is "quintessential protected activity").  As the Court concluded above, *see supra* Section IV.A.1.a., there is no dispute that Plaintiff suffered an adverse employment action when she was terminated.  The only question is whether her termination was causally connected to her various complaints of discrimination and harassment.  Because Plaintiff was terminated on January 14, 2016, [Defs.' SOMF ¶ 120], only a couple of months after this litigation began and less than six months after she filed her EEOC charges, there is sufficient evidence at least to raise an inference of causation.  *See, e.g.*, *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (explaining that a discharged employee can raise an inference of causation when there is a close temporal connection between protected activity and the adverse employment action).  Therefore, the pertinent question is whether Defendants can articulate legitimate, non-

retaliatory reasons for Plaintiff's termination, *see Fuentes*, 32 F.3d at 763, which the Court addresses next.

### 2. Reed Smith's Justifications & Pretext Analysis.

With the exception of Plaintiff's retaliation claims, the Court concluded that Plaintiff had failed to meet her prima facie burden to preclude summary judgment as to her racial discrimination claims under Title VII and the NJLAD. Even so, the Court will assume *arguendo* that Plaintiff has made this showing and consider whether Defendants have set forth legitimate, non-discriminatory and non-retaliatory reasons for each of the actions that Plaintiff believes to be unlawful and whether Plaintiff has pointed to record evidence to prove that Defendants' reasons were pretextual. *See McDonnell Douglas*, 411 U.S. at 802–04. To show that an employer's explanation constitutes pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

Recall that Plaintiff alleges that Defendants violated Title VII and the NJLAD by "writing her up" for "fallacious" performance issues, placing her on a PIP, dismissing her from the FIG, placing on her administrative leave with pay, and ultimately terminating her employment, all on account of her race. [Pl.'s Br. at 12.] As noted above, she also contends that these actions all demonstrate that Reed Smith retaliated against her. In response, Defendants argue that legitimate reasons existed

for each of these decisions.  [Defs.' Br. at 10.]  Because of the overlapping nature of Plaintiff's discrimination and retaliation claims, the Court focuses on the facts and begins with Plaintiff's performance issues, negative feedback, and placement on a PIP.

Defendants contend that Plaintiff encountered challenges adjusting to her new role following her July 2014 promotion to the Tier 1 Paralegal position. [*Id.*] For instance, Plaintiff failed to sufficiently communicate with her team, routinely took her lunch break outside of "core" hours, modified her schedule without the approval of her supervisors, and worked on matters while she was out on vacation without permission to do so, resulting in the firm's obligation to pay her overtime. [Defs.' SOMF ¶¶ 64–68, 72–75.]  Plaintiff was informed that use of overtime required supervisor approval.  [Defs.' SOMF ¶ 58; *see* July 2, 2014, Mem. at 1, Defs.' Ex. 27, Docket No. 220-5.]  Moreover, her frequent requests to use overtime became an issue, resulting in an e-mail from Ms. Bettino, the supervising partner of the FIG, who directed Plaintiff to complete her work during standard working hours.  [Defs.' SOMF ¶ 70; *see also* August 12, 2014 1:27 p.m. e-mail from Ms. Bettino to Plaintiff and Mses. Weller and Phillips, Defs.' Ex. 33.]  Principally for these reasons, Plaintiff was asked to speak with Mses. Weller, Sullivan, and Papanier and placed on a PIP.  [Defs.' SOMF ¶ 61.]  The Court finds that these reasons are plainly legitimate to justify Reed Smith's decision to place Plaintiff on a PIP.  *See DeCicco v. Mid-Atlantic Healthcare, LLC*, 275 F. Supp. 3d 546, 555–56 (E.D. Pa. 2017) (explaining that courts routinely accept a plaintiff's "failure to meet expected performance goals," "poor work performance," "unprofessional behavior," and "violation of internal company policies" as "facially

legitimate" reasons justifying an adverse employment action, including termination) (citations omitted); *see also Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 525–27 (3d Cir. 1992) (demonstrating that the task of a district court is not to second-guess employment decisions, but instead to determine whether they were motivated by an illegal discriminatory purpose).

To discredit the negative feedback that she received and Reed Smith's decision to place her on a PIP, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for the asserted non-discriminatory reasons.' " *Fuentes*, 32 F.3d at 765 (internal citation omitted) (cleaned up). On this score, Plaintiff cites to the Court's Memorandum Opinion at the pleading stage for the proposition that she "clearly demonstrates that the performance issues were manufactured." [Pl.'s Opp'n at 17 (citing Mem. Op. ¶¶ 11–12).] Not so. As the Court explained, this case moved forward on Plaintiff's allegations only; as discovery developed, Plaintiff adduced insufficient evidence to prove up her claims. The Court's Memorandum Opinion is hardly evidence by which a jury could find Reed Smith's explanations "unworthy of credence." Plaintiff has failed to meet her burden of proving pretext. *See Farzan v. Vanguard Grp., Inc.*, 582 F. App'x 105, 108 (3d Cir. 2014) (noting that a plaintiff cannot simply disagree with an employer's evaluation of her to prove pretext).

54

Next, consider Plaintiff's dismissal from the FIG.  Defendants explain that Plaintiff was removed from Ms. Bettino's group on October 2, 2014, following a September 19, 2014, incident in which Plaintiff entered Ms. Conroy's office without permission, removed a file, read comments that were not addressed to her attention, and questioned Ms. Conroy and Ms. Phillips about the comments.  [Defs.' Br. at 11; *see also* Defs.' SOMF ¶¶ 114–16; 2015 Memorandum at 22.]  Ms. Bettino "felt that Ms. Tiggett could no longer work in her Group because of concerns about client data privacy and Ms. Tiggett's improper entry into Ms. Conroy's office and review of the file." [2015 Memorandum at 22.]  Moreover, she expressed frustration that Plaintiff was continuing to take her lunch late in the day, and while she tried to be flexible, it had become a "regular thing."  [*Id.*]  The Court finds that Defendants have articulated a legitimate basis for removing Plaintiff from the FIG.  *See DeCicco*, 275 F. Supp. 3d at 555–56.

In response, Plaintiff asserts, without any record support, that she routinely entered Ms. Conroy's office without issue until the September 19th incident.  [Pl.'s Opp'n at 17.]  She also claims that Ms. Conroy's comments about her conduct being "sneaky" reveals her bias.  [*Id.*; *see, e.g.*, Oct. 1, 2014, e-mail from Ms. Conroy to Ms. Weller, Docket No. 236, at 126–27 (containing statements in response to solicitation for interim evaluation).]  Plaintiff's rebuttal[22] is not sufficient.  She has not introduced

---

[22] In her Counterstatement of Material Facts, Plaintiff also claims as follows:
Laura Conroy was the one who gave Ms. Ross permission to come into her office when Ms. Ross was working downstair for Donna Bates as a

evidence, beyond her mere argument, to show that she routinely entered Ms. Conroy's office to remove files or that doing so was common among other paralegals. Furthermore, as the decision to remove her from the FIG was also based on her other documented performance issues, she cannot cast doubt on the decision by insinuating without evidence that Ms. Conroy is biased against African Americans. This serious charge requires much more than Plaintiff has introduced. *See Fuentes*, 32 F.3d at 766 (declaring that plaintiff's allegation of bias "amount[ed] to little more than the schoolground retort, 'Not so,' " and "d[id] not create a material issue of fact").

The Court next addresses Plaintiff's administrative suspension with pay, which occurred on November 18, 2015, when this litigation began. [Defs.' SOMF ¶ 119.]

---

Client Services Specialist, and Laura Conroy was training her and Grayson on drafting discovery. At no time, did Ms. Ross ever "rifle" or even touch anything on Laura Conroy's desk. Ms. Ross came into the office looking to retrieve, as she had commonly done so many times before, a red well holding approximately 600-800 pages, that she placed in Laura Conroy's office. There were no others who could have given her this information because the only one who saw me in Laura's office was Megan Cichon. Because I am African-American, was raised, and am used to being watched in stores, I do not go spaces randomly touching things. Even at age 50, my hands are in my pockets or in front of me (it's the walking version of Driving While Black). Therefore, because Laura Conroy did not witness the narrative she provided on this date, I went to retrieve a file because I had a lightbulb moment. I looked around Ms. Conroy's office with my eyes and only touched the file when it was found. Where was the "sneakiness of it" when she had given me permission to go into her office and had not let me know that the permission had been withdrawn. Additionally, after four years, what is it about me that make me an individual who would all of a sudden be regarded as someone who is sneaky and rifling through anyone's office?

[Pl.'s CSOMF ¶ 116 (errors in original).]

Defendants explain that Plaintiff was placed on leave after Ms. Bettino received reports that Plaintiff had been "taunting people." [Pl.'s Obj. & Resp. Defs.' Interrog. No. 24, Defs.' Ex. 40, Docket No. 220-5; Defs.' SOMF ¶ 119.]  Plaintiff does not dispute this. [Pl.'s CSOMF ¶ 119.]   Unprofessional conduct is clearly a legitimate basis for an adverse employment action.  *See, e.g.*, *Kim-Foraker v. Allstate Ins. Co.*, 834 F. Supp. 2d 267, 281 (E.D. Pa. 2011) (noting that Allstate had satisfied its burden of showing a legitimate reason for employee's termination because employee often behaved unprofessionally, including screaming at other employees). As a result, the Court concludes that Plaintiff has not demonstrated that this decision was in any way pretextual.  *See Fuentes*, 32 F.3d at 764.

Finally, the Court addresses Plaintiff's termination.  Defendants explain that Plaintiff was laid off in a reduction-in-force to align Reed Smith's staffing levels with available work.  [Defs.' Br. at 12; Defs.' SOMF ¶ 120; *see also* Jan. 14, 2016, Ltr. from Michael C. Lynch to Plaintiff & Severance Mem., Defs.' Ex. 26, Docket No. 220-5.] This reason is plainly legitimate.  *See, e.g.*, *Saunders v. Se. Home Health Servs. of PA, LLC*, 2021 WL 1210006, at *5 (E.D. Pa. Mar. 31, 2021) (stating that elimination of an employee's position in a reduction-in-force following a corporate reorganization was facially legitimate because the plaintiff's position was "no longer necessary to the ongoing operations of [the company]").  To rebut this explanation, Plaintiff states that "[t]his is the pretextual reason Defendants gave for [her] separation," and she claims that Reed Smith hired another paralegal in the FIG after Plaintiff was placed on administrative leave in 2015.  [Pl.'s CSOMF ¶ 120.]   She does not identify this

57

paralegal, nor does she explain how this demonstrates that Reed Smith's justification for terminating her was pretextual. Plaintiff offers no evidence beyond her "rumored, unspecified, and uncorroborated" allegations, so the Court must conclude that she has failed to prove pretext. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 650 (3d Cir. 2015).

Accordingly, because Plaintiff has not provided any credible basis (i) to disbelieve Reed Smith's explanations for placing her on a PIP, removing her from the FIG, placing her on paid administrative leave, and ultimately terminating her employment or (ii) to conclude that an invidious discriminatory or retaliatory reason was likely a motivating cause of Reed Smith's actions, Plaintiff's Title VII and NJLAD claims must be dismissed.

**B.    ADEA and NJLAD.**

In Counts VI–X of the First Amended Complaint, Plaintiff asserts that she suffered disparate treatment in hiring and/or promotion, replacement, wrongful termination, hostile work environment, and retaliation, all as a result of her age. In Counts XVI–XVIII, she asserts substantially similar violations of the NJLAD based on her age. The Court observes that Plaintiff's claims of discrimination and retaliation on the basis of age are not meaningfully different from her Title VII and NJLAD claims. Accordingly, the Court need not engage in a lengthy analysis.

The ADEA was enacted in 1967 "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems

arising from the impact of age on employment." 29 U.S.C. § 621(b). To accomplish this purpose, the statute declares it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, under the NJLAD, it is unlawful for an employer to terminate an employee because of the employee's age. *See* N.J. Stat. Ann. § 10:5–12(a). In proving a claim for age discrimination under the ADEA or NJLAD, the same *McDonnell Douglas* framework applies. *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994); *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 300 (3d Cir. 2004). As a result, ADEA and NJLAD claims are frequently considered together. *See, e.g.*, *Waldron v. SL Indus., Inc.*, 849 F. Supp. 996, 1000 (D.N.J. 1994), *rev'd on other grounds*, 56 F.3d 491 (3d Cir. 1995).

Therefore, for a plaintiff to prevail, she must first set forth a prima facie case by showing that (1) she was 40 years of age or older, (2) she was discharged, (3) she was qualified for the job, and (4) she was replaced by a sufficiently younger person to create an inference of age discrimination. *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009); *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 234 (3d Cir. 1999). *But see Monaco*, 359 F.3d at 300 ("The NJLAD, though worded differently, similarly makes age discrimination unlawful but does not limit its protections to persons at least 40 years of age. In cases brought under either the ADEA or the NJLAD, the plaintiff's age actually must have played a role in the employer's decisionmaking process and had a determinative influence on the outcome of that process.") (citations omitted).

Ultimately, to recover in an age discrimination suit, "a plaintiff must prove, by a preponderance of the evidence, [that] age was a determinative factor in the employment decision at issue." *Kohn V. AT&T Corp.*, 58 F. Supp. 2d 393, 411 (D.N.J. 1999) (citing *Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir. 1991); *Bartek v. Urban Redevelopment Auth. of Pittsburgh*, 882 F.2d 739, 742 (3d Cir. 1989)).

Here, Plaintiff cannot establish a prima facie case for any of her age discrimination claims. While Plaintiff was (1) 40 years old (2) at the time she was laid off and there is no dispute concerning (3) her qualifications, Plaintiff has not established (4) that she was replaced by someone who was sufficiently younger than she. Plaintiff essentially acknowledges as much by blaming Defendants, and the Court, for failing to adduce the comparator evidence required to prove her claims. [*See* Pl.'s Opp'n at 21 ("Thus, if Ms. Ross was allowed the comparator discovery she was entitled to, she would have been able to prove that the person hired after her to Ms. Bettino's group, as a paralegal was in fact younger than her for the position she was RIF'd out of.").] Nor has Plaintiff pointed to any record evidence to show that her age played any role in Reed Smith's treatment of her while she was an employee. Because she has introduced no evidence in this regard and there is no cause to revisit the Court's several discovery decisions in this matter, Plaintiff's age discrimination claims under the ADEA and the NJLAD must be dismissed. *See Kohn*, 58 F. Supp. 2d at 412 (dismissing age discrimination claim because employee failed to introduce evidence that he was replaced by a sufficiently younger individual and relied on

"conclusory allegations of age discrimination" to support opposition to summary judgment).

Plaintiff's retaliation claim under the ADEA fares no better. Materially identical to Title VII, the ADEA makes it unlawful for an employer to retaliate against an employee for either "opposing any practice" made unlawful by the statute or for participating "in any manner" in an investigation, proceeding, or hearing under the statute. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (citing 29 U.S.C. § 623(d)). To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) the employer took an adverse employment action against her, and (3) there is a causal connection between the protected activity and the adverse employment action. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007); *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005). As above, retaliation claims are analyzed under the *McDonnell Douglas* framework. *Deville v. Givaudan Fragrances Corp.*, 419 F. App'x 201, 2015 (3d Cir. 2011).

Here, Plaintiff's retaliation claim under the ADEA must be dismissed for the same reasons that her retaliation claims under Title VII and the NJLAD must be dismissed: while there is sufficient evidence to raise, at the very least, an inference that her termination resulted from her EEOC charges based on the close temporal proximity between the two, she nevertheless fails to rebut Defendants' legitimate reason for her termination by proving pretext. There is no evidence in the record to show that age was a factor in her termination, or that her termination resulted from

her complaints of age discrimination.  In other words, Plaintiff fails to show pretext. As a result, her retaliation claim under the ADEA must be dismissed.

Therefore, summary judgment is warranted in Reed Smith's favor as to Plaintiff's ADEA and NJLAD claims. [23]

## C.   Equal Pay Act.

In Count XI of the First Amended Complaint, Plaintiff alleges that Reed Smith violated the Equal Pay Act, 29 U.S.C. § 206(d), by denying her job opportunities that were offered to a white male colleague (*i.e.*, Mr. Van Dyke) and for allegedly paying her less for performing substantially equal work.  The record evidence does not support Plaintiff's serious allegations.

The Equal Pay Act was enacted in 1963 to dismantle the lingering effects of the outmoded belief that " 'a man, based on his role in society, should be paid more than a woman even though his duties are the same.' " *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting S. Rep. No. 176, 88th Cong., 1st Sess., 1 (1963)).  The statute ushered in the general requirement that men and women be given "equal pay for equal work" regardless of sex.  *See* 29 U.S.C. § 206(d)(1).

Unlike Title VII and ADEA, claims based on the Equal Pay Act do not follow the *McDonnell Douglas* framework, but rather proceed in two steps.  First, the plaintiff must establish a prima facie case by demonstrating that "employees of the opposite

---

[23] Because of Plaintiff's evidentiary deficiencies, the Court finds it unnecessary to repeat Reed Smith's justification for terminating Plaintiff's position.  Its analysis as articulated above, *see supra* Section IV.A.2, would apply with equal force to Plaintiff's ADEA claims.

sex were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions." *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000) (citing *E.E.O.C. v. Del. Dep't of Health and Soc. Servs.*, 865 F.2d 1408, 1413–14 (3d Cir. 1989)). If the plaintiff can do so, "[t]he burden of *persuasion* shifts to the *employer* to demonstrate the applicability of one of the four affirmative defenses specified in the Act." *Id.* The four affirmative defenses are: (i) a bona fide seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1).

Here, Plaintiff fails to carry her burden of establishing a prima facie case. First, Plaintiff has not shown that she performed substantially similar work as Mr. Van Dyke, a white man who became a case assistant on September 3, 2013. [2015 Memorandum at 9.] To determine whether a plaintiff performs work equal to her comparator, courts focus on "whether the jobs to be compared have a 'common core' of tasks." *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 156 (3d Cir. 1985). Plaintiff here alleges that when she was a non-billable client services specialist, she performed the duties of a billable case assistant. [Defs.' SOMF ¶ 56; *see* Pl.'s CSOMF ¶ 56 ("In the Princeton office, Case Assistant/Paralegal/Client Services Specialist can and many times did do the exact same work.").] However, the record contains no evidence to establish that Plaintiff in fact performed the same tasks, or had the same job responsibilities, as Mr. Van Dyke. Similarly, Plaintiff has not shown that she was paid a salary different from Mr. Van Dyke's. The Court does not have any information

63

before it about Mr. Van Dyke's salary, so it cannot compare the compensation of Plaintiff and Mr. Van Dyke. Because Plaintiff's Equal Pay Act claim is simply unsupported speculation, it must be dismissed at this stage.[24] *See Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (noting that "speculation and conjecture may not defeat a motion for summary judgment") (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)); *Dabone v. Thornburgh*, 734 F. Supp. 195, 199 (E.D. Pa. 1990) ("[A]ssertions in briefs are not competent evidence unless agreed to by the adverse parties.") (citing *Braden v. Univ. of Pittsburgh*, 477 F.2d 1, 6 (3d Cir. 1973)); *see also Unger v. City of Mentor*, 2009 WL 10702570, at *8 (N.D. Ohio Jan. 12, 2009) (dismissing Equal Pay Act claim at the pleading stage because plaintiff only asserted, in speculative and conclusory fashion, that she "received a lower wage" than that of her "male counterparts for performance of equal work").

## D.    FMLA and NJFLA.

In Counts XII and XXV of the First Amended Complaint, Plaintiff asserts that Reed Smith violated the FMLA and the NJFLA when it denied her request for intermittent medical leave to care for her ill daughter and subsequently required her to provide additional documentary support. [First Am. Compl. ¶¶ 242–50, 350–54.] Defendants argue that Plaintiff's claims should be dismissed because the record

---

[24] Plaintiff would appear to acknowledge that this result is required because the record does not contain the necessary comparator evidence. [*See* Pl.'s Opp'n at 22 ("Plaintiff's [sic] requires the personnel records she's entitled to, to establish a claim under the Equal Pay Act.").] Discovery has long since closed, and Plaintiff had numerous opportunities to pursue this information.

evidence fails to show that they denied her claim for medical leave.  [Defs.' Br. at 20–22.]   In opposition, Plaintiff submits that Reed Smith improperly requested recertification of her daughter's health condition within thirty (30) days of her initial certification in violation of 29 C.F.R. § 825.308.  [Pl.'s Opp'n at 23.]  The Court evaluates Plaintiff's theory of injury as an interference claim.

The FMLA provides that eligible employees are entitled to twelve (12) workweeks of leave during any twelve (12)-month period due to an employee's child's serious health condition.  29 U.S.C. § 2612(a)(1)(C).  An employer may require a certification from the employee's child's health care provider for a request for leave under such subparagraph.  *Id.* § 2613(a).  The statute provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  *Id.* § 2615(a)(1).  The FMLA and the NJFLA are identical in all respects material here, *compare* 29 U.S.C. §§ 2612(a)(1) and 2615(a)(1), *with* N.J. Stat. Ann. §§ 34:11B–4a, 34:11B–4e, and 34:11B–9a, so the Court considers the statutes together.  *See Wolpert v. Abbott Labs.*, 817 F. Supp. 2d 424, 437 (D.N.J. 2011) ("[C]ourts apply the same standards and framework to claims under the FMLA and the NJFLA.") (citing *Santosuosso v. NovaCare Rehabilitation*, 462 F. Supp. 2d 590, 596 (D.N.J. 2006)).

To establish a claim of interference under the FMLA, a plaintiff must prove the following elements:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant

of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014) (citing *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008)).  Here, there is no dispute concerning the first four elements; the only dispute concerns whether Plaintiff was denied a benefit to which she was entitled under the FMLA (or NJFLA).

The record evidence before the Court fails to show that Reed Smith denied Plaintiff's request for medical leave.  According to Plaintiff, she requested intermittent medical leave on September 11, 2015, to care for her daughter.  [First Am. Compl. ¶ 247; *see also* Defs.' SOMF ¶¶ 124; *accord* Pl.'s CSOMF ¶ 124.]  She claims that she provided Reed Smith with an appropriate certification from her daughter's physician. [First Am. Compl. ¶ 247.]  Plaintiff fails to provide a copy of this certification, however, and Defendants point out that no such evidence is in the record.  [Defs.' Br. at 21–22.]  Then, on October 13, 2015, Plaintiff contacted Bonita Fenoglietto, a Reed Smith Benefits Coordinator, to ask about taking FMLA time for her daughter's doctor's appointment scheduled for the next day.  [Defs.' SOMF ¶ 126.]  Plaintiff wrote: "Since my FMLA has not yet been approved, please advise."  [Oct. 13, 2015, 3:14 p.m. e-mail from Plaintiff to Bonita Fenoglietto, "Pl.'s Ex. L-6," Docket No. 9-17, at 17.]  Ms. Fenoglietto clearly indicated in reply that the certification had yet to be received, and so FMLA requests would be reviewed on a "case-by-case basis." [Oct. 13, 2015, 5:05 p.m. e-mail from Ms. Fenoglietto to Plaintiff, Docket No. 9-17, at 16.]  Still, in any event, she ***approved*** the request as "FMLA time," "assuming

[Plaintiff's daughter's] appointment tomorrow is related to the condition described in the original FMLA certification."  [*Id.*]  There is no record evidence demonstrating that Plaintiff ever provided Ms. Fenoglietto with any completed FMLA certification. [Defs.' SOMF ¶ 127.]  In these circumstances, because Plaintiff's request for leave was approved, her interference claim is simply not viable.  *See Ross*, 755 F.3d at 192 ("[W]e have made it plain that, for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld.") (citing *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005)).  Given the lack of evidence concerning Plaintiff's daughter's certifications, it is of no moment whether Reed Smith requested recertification more often than permitted by 29 C.F.R. § 825.308.  Plaintiff's conclusory allegations are insufficient to survive summary judgment.

Therefore, as the record does not support Plaintiff's claims under the FMLA and the NJFLA, they must be dismissed accordingly.

## E.   CEPA.

In Count XXIV of the First Amended Complaint, Plaintiff asserts a violation of the New Jersey Conscientious Employee Protection Act (CEPA), N.J. Stat. Ann. § 34:19-1.  Defendants argue that Plaintiff failed to establish a viable CEPA claim, [Defs.' Br. at 22–25], and Plaintiff appears to agree, [*see* Pl.'s Opp'n at 23 ("Plaintiff waives claims for violation of CEPA.")].  Finding that Plaintiff expressly indicated an intention to abandon her CEPA claim, the Court dismisses it accordingly.  *See, e.g., Neidigh v. Select Specialty Hosp.–McKeesport*, 150 F. Supp. 3d 573, 574 n.1 (W.D. Pa. 2015) (dismissing claim because plaintiff expressed intention to abandon claim in brief

in opposition to defendant's motion for summary judgment); *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 642 (D.N.J. 2010) (dismissing state-law claims where plaintiff clearly expressed intention to do so in brief's heading, as Plaintiff does here).

>    **F.      Negligent Retention and Supervision.**

In Count XXVI of the First Amended Complaint, Plaintiff brings a claim for negligent retention and supervision against Reed Smith.  She alleges that Reed Smith was aware of the harassment and discrimination she has alleged but nonetheless failed to ensure a safe working environment.  [*See* First Am. Compl. ¶¶ 355–61.]  Defendants contend that Plaintiff's allegations are groundless.  [Def.s' Br. at 25–26.]

Like her CEPA claim, Plaintiff expressly indicates that "[t]he record does not support these allegations," though unlike her CEPA claim, she blames Defendants for "refus[ing] to turn over the personnel files of the individual names, including both Donna Bates, Esq., and Diane Bettino."  [Pl.'s Opp'n at 24.]  The Court has no cause to revisit its discovery decisions here.  As Plaintiff has failed to meaningfully oppose Defendants' argument in support of dismissal, the Court concludes that dismissal is warranted.  *See Nat'l R.R. Passenger Corp. v. Pa. Pub. Utility Com'n,* 342 F.3d 242, 259 n.14 (3d Cir.2003) (recognizing that party waived claim where it inadequately briefed issue) (citing *Reynolds v. Wagner,* 128 F.3d 166, 178 (3d Cir.1997)); *see also Sanofi-Aventis U.S., LLC v. U.S. Dept' of Health and Human Servs.*, 570 F. Supp. 3d 129, 172 (D.N.J. 2021) (deeming claim abandoned where party did not support claim with evidence in its brief), *rev'd in part on other grounds, and aff'd in part*, 58 F.4th 696 (3d Cir. 2023); *Celestial Cmty. Dev. Corp. v. City of Phila.*, 901 F. Supp. 2d 566, 578 (E.D. Pa. 2012) ("To

put it simply: plaintiffs who fail to brief their opposition to portions of motions to dismiss do so at the risk of having those parts of the motions to dismiss granted as uncontested.").

### G.   Defamation.

In Count XXVII of the First Amended Complaint, Plaintiff asserts that Defendants, through their counsel, allowed "knowingly false and defamatory statements to be made and published regarding Plaintiff's performance to the New Jersey Law Journal." [First Am. Compl. ¶ 362.]   The relevant statement is from Defendants' motion papers in support of dismissing Plaintiff's initial Complaint:  that this civil action is "solely . . . an attempt to embarrass her employer, and to deflect attention away from her own deficient performance issues." [*Id.*]  Plaintiff asserts that her performance at Reed Smith was not deficient, that Defendants "communicated" this false statement to the New Jersey Law Journal with the intent to intimidate her for filing this lawsuit, and that the statement adversely impacted her ability to secure legal employment.  [*Id.* ¶¶ 363–64.]

Defendants seek the dismissal of Plaintiff's claim for defamation.  [Defs.' Br. at 26.]  First, they argue that the allegedly defamatory statements are covered by the litigation privilege.  [*Id.* at 26–27.]  Second, in any case, they argue that the record evidence demonstrates that Plaintiff had several performance issues, so there is no genuine dispute as to whether Defendants made knowingly false statements.  [*Id.* at 28.]  In reply, Plaintiff concedes that the litigation privilege covers statements made by attorneys during the course of a judicial proceeding, but she nevertheless argues that it

should not apply here because Defendants have allegedly "blacklisted" her.  [Defs.'
Opp'n at 24–26.]  She further seeks to assert a claim for "malicious use of process" "in
the alternative."  [*Id.* at 26.]

There is no merit to Plaintiff's claim for defamation.  "The litigation privilege
generally protects an attorney from civil liability arising from words he has uttered in
the course of judicial proceedings." *Loigman v. Twp. Comm. of Twp. of Middletown*, 889
A.2d 426, 433 (N.J. 2006).  Deeply rooted in New Jersey common law, *see Fenning v.
S.G. Holding Corp.*, 135 A.2d 346, 350 (N.J. Super. Ct. App. Div. 1957), and akin to
judicial, prosecutorial, and witness immunity, *see Loigman*, 889 A.2d at 435, the
litigation privilege safeguards an attorney from defamation suits, among other tort-
related claims, to ensure "full freedom of speech in conducting the causes, and
advocating and sustaining the rights, of his clients." *Id.* at 436 (cleaned up) (citation
omitted).  Specifically, it protects "any communication (1) made in judicial or quasi-
judicial proceedings; (2) by litigants or other participants authorized by law; (3) to
achieve the objects of the litigation; and (4) that have some connection or logical
relation to the action." *Hawkins v. Harris*, 661 A.2d 284, 289 (N.J. 1995) (citation and
internal quotation marks omitted).

Here, as Plaintiff recognizes, Defendants' statements regarding her performance
issues come within the ambit of the litigation privilege.  They were communicated in
Defendants' motion papers filed in this civil action to secure the dismissal of Plaintiff's
employment discrimination claims, and they were cited by the New Jersey Law
Journal based on its independent coverage of this action.  The privilege thus applies,

70

*see Hawkins*, 661 A.2d at 289, and Plaintiff's defamation claim must be dismissed accordingly.[25]

Her purported claim for "abuse of process" fares no better.  Plaintiff failed to plead this claim in her First Amended Complaint, so the Court will not consider it. *See, e.g.*, *Anderson v. DSM N.V.*, 589 F. Supp. 2d 528, 535 n.5 (D.N.J. 2008) (refusing to consider new breach of contract claim raised, for the first time, in opposition to motion for summary judgment).[26]

### H.    Motion to Seal.

Finally, the Court addresses Defendants' request to seal the 2015 Memorandum, [Defs.' Ex. 22, Docket No. 221], a document prepared following Reed Smith's internal investigation into Plaintiff's allegations of discrimination and

---

[25] In so holding, the Court need not address whether Plaintiff could prevail as to her theory of defamation.  While the Court is committed to ensuring that attorneys comply with their professional responsibilities and the requirements imposed by Federal Rule of Civil Procedure 11—and, to be clear, Plaintiff has provided no basis to doubt whether Defendants' counsel has been deficient in this regard—defamation is simply not actionable in these circumstances.  *See Loigman*, 889 A.2d at 435.

[26] In any case, the Court must observe that Plaintiff supports her claim for "abuse of process" by, once again, impugning the character of her adversary by suggesting that he treats white people differently from Black people.  [*See* Pl.'s Opp'n at 26 (asserting that counsel "has made some of the most biting and disparaging comments" against her but has been "civil" in a similar employment litigation against Reed Smith that was brought by a white partner).]  The Court specifically directed Plaintiff to cease this vexatious conduct after she claimed, without any support whatsoever, that Defendants' counsel had " 'Amy Coopered' [his] way through this entire litigation" and employed "dog whistles."  [June 7, 2023, Order, Docket No. 207, at 3–4 (citing Docket No. 201, at 2; Docket No. 202, at 1–2); *see also id.* at 5 n.1 (advising Plaintiff, now a practicing attorney, of her professional obligations in the State of New York; *id.* ¶ 5 (ordering Plaintiff to "cease and desist from impugning the character of Defendants' counsel").]  **This conduct must stop.**

retaliation.  [Defs.' Mot. Seal, Docket No. 239.]   In support of their request, they contend that the investigative report contains sensitive and confidential information, the disclosure of which could compromise the integrity of internal workplace investigations and the reputations of the parties and non-party witnesses.  [Cert. of Sean P. Joyce ¶ 5, Docket No. 239-1.]  Plaintiff opposes the Motion to Seal.  [Docket No. 240.]  She contends that Defendants have not met their burden of demonstrating why the 2015 Memorandum must be sealed in full, suggesting that it can be redacted. [*Id.* at 2.]  In their Reply Brief, Defendants contend, among other things, that redaction of the document is not possible.  [Docket No. 241, at 7.]  They direct the Court's attention to *Jorjani v. N.J. Inst. of Tech.*, 2022 WL 1811304 (D.N.J. June 2, 2022).

        In *Jorjani*, a former employee opposed an educational institution's motion to seal an investigation report prepared by an outside law firm.  2022 WL 1811304, at *6. In support of its request, the institution identified its concern that disclosure of the report would damage the integrity of future investigations by chilling participation.  *Id.* The *Jorjani* court found this interest compelling:  "As Defendants note, public disclosure of the Saiber Report, which contains the interview summaries and statements of nonparties provided under the auspices of confidentiality could chill future witnesses and complainants from participating in the investigatory process. Moreover, Defendants' concerns about NJIT personnel sharing such information, if disclosed to the public, is a legitimate basis for sealing."  *Id.*  Finally, the court found that redaction would not be possible, though it did not explain why.  *Id.*

Local Civil Rule 5.3 directs courts to consider the following factors in weighing whether to permit a document to be sealed on the docket:

    (a) the nature of the materials or proceedings at issue;

    (b) the legitimate private or public interest which warrants the relief sought;

    (c) the clearly defined and serious injury that would result if the relief sought is not granted;

    (d) why a less restrictive alternative to the relief sought is not available;

    (e) any prior order sealing the same materials in the pending action; and

    (f) the identify of any party or nonparty known to be objecting to the sealing request.

L. Civ. R. 5.3(c)(3).

Here, having considered the above factors, this Court comes to the same conclusion as the *Jorjani* court. The 2015 Memorandum is a confidential internal investigation report prepared by Reed Smith legal counsel. It contains sensitive personnel information, including employees' dates of birth and religious affiliation, as well as summaries of conversations conducted under the auspices of confidentiality. It also contains information about Reed Smith clients and work product. Reed Smith's concerns about the integrity of future investigations and personnel and client confidentiality are legitimate private reasons to seal the 2015 Memorandum that outweigh the public's interest in disclosure. *See Jorjani*, 2022 WL 1811304, at *6. Because the Court finds that most of the document would need to be redacted in order to permit disclosure, the fourth factor weighs in favor of sealing the 2015 Memorandum too. Accordingly, the Court will grant the Motion to Seal.

## V.  CONCLUSION

For the reasons expressed above, Defendants' Motion for Summary Judgment [Docket No. 220] and Motion to Seal [Docket No. 239] will be **GRANTED**.  An Order shall issue separately.  *See* Fed. R. Civ. P. 58(a).

<u>**s/Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge

DATED:  <u>**April 30, 2024**</u>